EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Arnold Valle Izquierdo<br>Arnold Valle Ortiz<br>    Demandantes-peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico,<br>et als.<br>    Demandados-recurridos | Certiorari<br><br>2002 TSPR 64<br><br>156 DPR _____ |

Número del Caso: CC-2000-923

Fecha: 14/mayo/2002

Tribunal de Circuito de Apelaciones:
                    Circuito Regional IV

Juez Ponente:
                    Hon. Jocelyn López Vilanova

Oficina del Procurador General:
                    Lcda. Mayra J. Serrano Borges
                    Procuradora General Auxiliar

Abogado de la Parte Peticionaria:
                    Lcdo. Tomás E. Vivoni Alcaraz

Materia: Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Arnold Valle Izquierdo
Arnold Valle Ortiz

    Demandantes-peticionarios

       vs.                CC-2000-923     CERTIORARI

Estado Libre Asociado de
Puerto Rico, et als.

    Demandados-recurridos


**Opinión del Tribunal emitida por el Juez Asociado SEÑOR REBOLLO LÓPEZ**

San Juan, Puerto Rico, a 14 de mayo de 2002


Allá para el año 1996, el Negociado de Investigaciones Especiales --en lo sucesivo el N.I.E.-- del Departamento de Justicia de Puerto Rico llevó a cabo una investigación sobre ciertas operaciones delictivas, relacionadas las mismas al crimen organizado, que alegadamente estaban ocurriendo en el área oeste de la Isla. Participaron en dicha operación varios agentes encubiertos del N.I.E., cuyas funciones eran las de realizar transacciones delictivas relativas, en su mayoría, al trasiego de sustancias controladas. Como resultado de la mencionada investigación se determinó causa probable contra varios ciudadanos, expidiéndose treinta y seis (36) órdenes

de arresto; determinaciones de causa probable realizadas <u>en</u> <u>ausencia</u> de las personas que fueron encausadas.

El día 1 de mayo de 1996 se llevó a cabo un operativo con el fin de <u>diligenciar</u> las órdenes de arresto expedidas. Durante horas de la madrugada de ese día, varios agentes del N.I.E. se personaron a la residencia del aquí peticionario, Arnold Valle Izquierdo, procediendo a diligenciar la orden de arresto <u>alegadamente</u> expedida en su contra producto de la radicación de tres denuncias por violación a los Artículos 401, 403(b), y 406 de la Ley de Sustancias Controladas, 24 L.P.R.A. secs. 2401, 2403(b) y 2406, respectivamente, sometidas originalmente contra un tal "John Doe I".[1]

Valle Izquierdo fue arrestado y transportado hasta el Centro Judicial de Aguadilla, donde un magistrado, al no poder Valle Izquierdo prestar las fianzas fijádoles, ordenó su ingreso en una institución penal; originalmente éste fue ingresado en la Cárcel de Sabana Hoyo, luego trasladado hasta la Cárcel de Bayamón, hasta finalmente ser ingresado en la Penitenciaria Estatal de Río Piedras. Valle Izquierdo estuvo encarcelado alrededor de tres días hasta que su padre pudo realizar las gestiones necesarias para lograr satisfacer el pago de las fianzas impuestas.

Luego de cuatro suspensiones, el día 26 de agosto de 1996 se celebró la vista preliminar al amparo de las

---

[1] En el caso específico del demandante, <u>como no se tenía conocimiento de su nombre</u>, la orden de arresto en su contra estaba dirigida contra un tal "John Doe I". Ello como consecuencia de varias <u>supuestas</u> transacciones que éste había realizado con el agente, Antonio Calafell.

disposiciones de la Regla 23 de Procedimiento Criminal. Una vez allí, y a petición de la fiscalía, el juez que presidió la misma determinó inexistencia de causa para procesar criminalmente a Valle Izquierdo, ordenando el archivo de los tres cargos que pesaban en su contra. Ello por razón de que el agente encubierto, Antonio Calafell, con el cual alegadamente Valle Izquierdo había llevado a cabo las transacciones de drogas, declaró allí, y bajo juramento, que Valle Izquierdo no era la persona con quien realmente había realizado las transacciones delictivas, que sirvieron de base a las órdenes de arresto, por las cuales se le pretendía encausar.

A raíz de estos hechos, Valle Izquierdo y su padre, Arnold Valle Ortiz, radicaron demanda en daños y perjuicios contra el Estado Libre Asociado de Puerto Rico ante la Sala Superior de Mayagüez del Tribunal de Primera Instancia en reclamo de los daños por ellos sufridos a causa del arresto y encarcelación ilegal de Valle Izquierdo. Alegaron que el Estado, en carácter de patrono de los agentes que participaron en la investigación y subsiguiente arresto del demandante, respondía por la negligencia desplegada por éstos en el desempeño de sus funciones.[2] El Estado contestó la demanda negando toda responsabilidad.

---

[2]   Véase Artículos 1802 y 1803 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 5141 y 5142, respectivamente.

Véase, además, la Ley de Reclamaciones y Demandas contra el Estado, Ley Núm. 104 de 29 de junio de 1955, 32 L.P.R.A. sec. 3077.

Luego de varios trámites procesales[3], tuvo lugar la celebración del juicio en su fondo. Durante la vista, la única prueba documental ofrecida por el Estado y, admitida en evidencia, lo fue un Informe de Vigilancia en el que se describe a "John Doe I" como una persona de edad aproximada de 21 años, <u>peso aproximado de unas 130 libras y unos 5 pies con 5 pulgadas de estatura</u>. Cabe destacar que el demandante tiene 23 años de edad, <u>mide unos seis pies de estatura y tiene un peso aproximado de 180 libras</u>. Se estipuló, además, la siguiente prueba documental, a saber: 1) denuncia por violación al Artículo 402 de la Ley de Sustancias Controladas; 2) denuncia por violación al Artículo 403-b de la Ley de Sustancias Controladas; 3) denuncia por violación al Artículo 406 de la Ley de Sustancias Controladas y; 4) notas y resolución del caso en vista preliminar.

La prueba testifical presentada por los demandantes consistió de los testimonios de los dos demandantes y el testimonio del Dr. Francisco Arizmendi, Psicólogo Clínico, que estuvo a cargo de la evaluación mental de Valle Izquierdo a partir de su excarcelación. Por otro lado, la prueba

---

[3]     Durante la conferencia con antelación al juicio, las partes llegaron a una serie de estipulaciones, entre éstas, a saber: 1) que se radicaron denuncias contra "John Doe I" por violación a los Artículos 401, 403 (b) y 406 de la Ley de Sustancias Controladas; 2) que se fijó fianza de $10,000.00 en cada caso; 3) que se arrestó al demandante Arnold Valle Izquierdo el 1ro de mayo de 1996 en horas de la madrugada en su casa; 4) que Arnold Valle Izquierdo fue encarcelado; 5) que fue fichado por el Negociado de Investigaciones Especiales del Departamento de Justicia; 6) que fue exonerado de los cargos que le imputaron por no ser la persona que realizó la transacción.

desfilada por la parte demandada consistió de los testimonios de los agentes Alfred González Lasalle, Edwin Adorno Colón, Antonio Calafell y Willie Santiago Morales.[4]

Según surge de las determinaciones de hecho realizadas por el tribunal de instancia, el agente Calafell declaró que trabajó como agente encubierto durante la investigación especial en cuestión y que, durante el mes de marzo de 1996, llevó a cabo las transacciones de drogas que provocaron las radicaciones de cargos y diligenciamientos de arresto, entre los cuales se arrestó y encarceló al demandante Valle Izquierdo. Declaró que, con posterioridad a la ocurrencia de la transacción delictiva, no participó personalmente en un procedimiento de identificación del demandante como tampoco en el operativo en que se arrestó al demandante, no estando presente allí para identificarlo.

Sostuvo que se procedió con su arresto por error. Justificó el mismo alegando que el demandante tenía una guagua color amarilla, marca Ford, modelo "Splash", registrada a su nombre en el Departamento de Transportación y Obras Públicas, similar al vehículo que conducía la persona con quien realmente realizó la transacción. Indicó que fue, precisamente, durante la celebración de la vista preliminar que pudo ver de cerca al demandante, pudiendo percatarse de

---

[4] Todos éstos participaron, de una forma u otra, en la investigación y en el subsiguiente operativo durante el cual se diligenciaron las órdenes de arresto; entre éstas, aquella contra el demandante.

**que, dado su peso y estatura, <u>no</u> era la persona con quien realmente llevó a cabo la venta de sustancias controladas.**

Testificó, además, el agente Willie Santiago Mercado, agente a cargo de la fase de inteligencia de la policía en el área de Cabo Rojo, Hormigueros y San Germán. Según consta en las determinaciones de hecho del tribunal de instancia, éste declaró que, dada la información provista por el Departamento de Transportación y Obras Públicas, donde apareció el nombre de Arnold Valle Izquierdo como dueño de una guagua modelo Splash, a través de un sistema VADIS, se le proveyó <u>un retrato</u> del demandante. Santiago Mercado sostuvo que le mostró dicho retrato al agente Calafell y que éste último le indicó que la persona allí retratada, Valle Izquierdo, <u>tenía cierto parecido con la persona con quien había realizado la transacción</u>. Determinó, además, el tribunal de instancia que, el día del operativo, el agente Santiago Mercado fue quien tenía en su poder la documentación y órdenes de arresto. Que, tanto Santiago Mercado como otros agentes, acudieron a la residencia del demandante, que éste último les proveyó su nombre, les entregó su licencia de conducir y que, de esa manera, alegadamente "corroboraron" que se trataba de Arnold Valle Izquierdo, persona que a su vez aparecía en el retrato provisto. Así pues, procedieron sin más a leerle las advertencias de ley y lo arrestaron. El agente Santiago Mercado declaró, además, que <u>desconocía</u> si en realidad Valle Izquierdo era la persona con quien realmente el agente Calafell había

realizado la transacción de drogas, pues sólo se basó en la información que recopiló del DTOP.

El agente Edwin Adorno Colón testificó que era el <u>agente encargado</u> del caso y que fue quien tuvo el contacto directo con el agente encubierto Calafell. Era la persona que tenía la custodia del expediente de las personas investigadas. Este declaró que las denuncias relacionadas con Valle Izquierdo fueron radicadas originalmente a nombre de un tal "John Doe I". Adorno Colón <u>tampoco</u> estuvo presente al momento del arresto de Valle Izquierdo. Por último, el agente Alfred González Lasalle se limitó a declarar que sólo participó del caso en su fase investigativa, prestando así vigilancia y seguridad al agente encubierto Calafell.

Determinó probado el tribunal de instancia, a base de los testimonios brindados por los demandantes, que para el día 1 de mayo de 1996 el demandante Valle Izquierdo residía en un apartamento alquilado en el Edificio Interamericana, municipio de San Germán. Que a eso de las 5:00 a.m., varios agentes vestidos de negro, con emblemas oficiales, y armas largas, tocaron a su puerta, entraron a su residencia y procedieron a arrestarlo. <u>Durante el transcurso del operativo estuvieron presentes los medios noticiosos</u>. Ello dio lugar a que el mismo se transmitiera a través de las noticias televisadas, tanto en Puerto Rico como en Estados Unidos, <u>identificándose a las personas arrestadas como traficantes de drogas</u>.

Señaló, además, dicho foro que, al momento de su arresto, Valle Izquierdo no sabía por qué lo estaban arrestando, no tenía conocimiento de los hechos que se imputaban en la denuncia, y que, incluso, fue encarcelado sin conocer los motivos para ello.[5] Determinó el tribunal que, desde lo acontecido, la gente trata al demandante de otra manera y que éste <u>no</u> ha podido conseguir trabajo, pues las personas sólo tienen conocimiento de lo que se publicó en las noticias como resultado de su arresto y no conocen el resultado del caso.

En cuanto al padre, sostuvo el tribunal que el día de los hechos, cuando se dirigía a su trabajo, le dijeron sobre el arresto de su hijo, y de que la policía se lo había llevado detenido. Acudió al cuartel en busca de información, más no le pudieron ofrecer detalle alguno sobre el paradero de su hijo. Fue durante el transcurso del día que pudo conocer sobre lo que había ocurrido, así como sobre la cantidad de la fianza que le fue impuesta. Luego de hacer innumerables gestiones, al cabo de tres días, pudo coger prestado el diez por ciento de la misma y lograr sacar a su hijo de la cárcel. Ciertamente, las imputaciones que se hicieran en contra de su hijo le tomaron por sorpresa y le afectaron grandemente.

Determinó probado, además, el tribunal que, mientras el demandante estuvo en la cárcel, <u>vivió serios traumas que</u>

---

[5] Determinó que, ya de regreso a su residencia, el demandante se encontró con que habían entrado a la misma y que estaba todo revuelto. De hecho, la persona que cobraba la renta, a instancias del arrendador, le exigió abandonarla.

**lo "abochornaban" como hombre.**[6] **Tomando como base el testimonio del perito de los demandantes, Dr. Arizmendi, el tribunal sostuvo que, a raíz de su arresto, el demandante comenzó a padecer de lo que se conoce como "post traumatic stress disorder", siendo su caso uno agudo porque se encontraba en un estado confuso, negativo y traumatizado; trauma que a su vez no desaparece y que sólo disminuye. Expresó que tanto una denuncia por trasiego de drogas como la privación de la libertad es una amenaza real para la salud mental de cualquier individuo así como para su reputación.**[7] **Expuso, además, que el demandante muestra rasgos de ansiedad, depresión, rasgos paranoides, que se siente perseguido, y que no confía en nadie.**

Finalmente, luego de aquilatar la prueba desfilada por ambas partes, el Tribunal de Primera Instancia dictó sentencia declarando <u>sin lugar</u> la demanda incoada por  los demandantes. Sostuvo el foro primario que el mero arresto de una persona inocente no es base suficiente para configurar una causa de

---

[6]    Es pertinente señalar que en la demanda, Valle Izquierdo alegó que durante su encarcelación fue víctima de <u>ataques físicos y sexuales</u> por parte de otros confinados. Que mientras estuvo allí, siempre tuvo el temor de perder su vida.

[7]    Según el testimonio del Dr. Francisco Arizmendi, los criterios para el "post traumatic stress disorder" son los siguientes: 1) que la persona haya experimentado o confrontado una situación que envuelva amenaza que provenga del exterior; 2) que esa amenaza cree temor y horror. Tal trauma se manifiesta tratando de evitar todo aquello que tenga que ver con la experiencia y que es posible temerle a las terapias de recuperación por no querer revivir la misma. Véase determinación de hecho, núm. 29, Sentencia del Tribunal de Primera Instancia, Apéndice 7, págs. 27-28.

acción en daños y perjuicios. Concluyó que la prueba presentada demostró que el arresto del demandante <u>fue producto de la equivocación o error de juicio de un ser humano y no de la negligencia de los agentes envueltos</u>; error causado por el hecho de que el demandante había sido dueño de la guagua utilizada por el verdadero responsable de los hechos.[8] Expresó que aun cuando no podía abstraerse de los efectos traumatizantes que puede tener para un ser humano vivir la experiencia por la que pasó el demandante, ello no significaba que la actuación de los agentes del N.I.E. hubiera sido una negligente.

Insatisfechos con tal determinación, los demandantes acudieron oportunamente ante el Tribunal de Circuito de Apelaciones, vía recurso de apelación. En su escrito, alegaron que el foro sentenciador incidió al concluir que la prueba aportada no estableció que el arresto de Valle Izquierdo fue producto de la negligencia de los funcionarios del Estado. Luego de los trámites apelativos pertinentes, el tribunal apelativo intermedio <u>confirmó</u> el dictamen emitido por el foro de instancia. En apoyo de tal determinación, sostuvo que no había duda de que el arresto del demandante fue ocasionado por un error, "<u>un grave error</u>", de los agentes del N.I.E., pero

---

[8]    **En apoyo de tal determinación, señaló el tribunal de Valle Izquierdo era dueño de una guagua Ford modelo Splash color amarilla; que al no poder satisfacer el pago de la misma, tuvo que entregarla, pero que ésta quedó registrada bajo su nombre.**

que el mismo no era atribuible a una plan malicioso de éstos[9].
Expresó el foro apelativo que ciertamente se trató de una
triste equivocación en la identificación de la persona contra
quien pesaba la orden de arresto. Concluyó el tribunal
apelativo que, en ausencia de circunstancias que justificaran
alterar el dictamen apelado, era su deber confirmar el mismo.

Inconformes, naturalmente, los demandantes acudieron en
revisión --vía oportuno recurso de certiorari-- ante este
Tribunal. Alegan los peticionarios que procede revocar la
sentencia emitida por el foro apelativo intermedio,
confirmatoria la misma de la dictada por el tribunal de
instancia, debido a que dicho foro incidió:

> "...en la aplicación del derecho a los hechos
> concluidos en la Sentencia;
>
> ...al concluir que no existió negligencia de la parte
> demandada a pesar de haber concluido que los daños
> fueron ocasionados por un grave error de los agentes
> del NIE (Negociado de Investigaciones Especiales)."

Expedimos el recurso solicitado. Contando con la
comparecencia de ambas partes, y estando en posición de
resolver el mismo, procedemos a así hacerlo.

II

---

[9] Cabe destacar que si se hubiese tratado de un plan malicioso e intencional, cosa que los demandantes nunca alegaron, ni siquiera estaríamos evaluando la procedencia de una causa de acción en daños y perjuicios contra el Estado, ya que la Ley de Pleitos contra el Estado no permite reclamaciones de esa índole basadas en actos intencionales de sus agentes, empleados o funcionarios. 32 L.P.R.A. sec. 3077 et seq.

Establece el Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141, que:

"El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización."

De conformidad con la referida disposición estatutaria, la reparación de un daño causado procede, siempre y cuando se demuestren varios elementos indispensables, sin los cuales no se configura causa de acción alguna que pueda ser reconocida bajo la doctrina de la responsabilidad civil extracontractual. Es norma harto conocida que el demandante, en una causa de acción por daños y perjuicios extracontractuales, <u>tiene que probar</u>: a) la existencia de una acción u omisión productora del acto ilícito extracontractual; b) la antijuricidad de la misma; c) la culpa o negligencia del agente; d) producción de un daño; y, e) relación de causa o efecto entre la acción u omisión y el daño.[10]

**Del mismo modo, hemos indicado que la referida disposición legal "se enuncia 'en forma general y sin concretarse a determinados tipos de infracción', lo que presupone una norma genérica que nos prohíbe causar daño a otro mediante conducta ya sea activa, ya pasiva." <u>Sociedad</u>**

---

[10] Santos Briz, *Comentarios al Código Civil y compilaciones forales,* España, Ed. Rev. Der. Privado, 1984, T. XXIV; H. Brau del Toro, <u>Los daños y perjuicios extracontractuales en Puerto Rico</u>, San Juan, Publicaciones JTS, 1986; <u>Sociedad de Gananciales v. González Padín</u>, 117 D.P.R. 94 (1986).

de Gananciales v. González Padín, 117 D.P.R. 94, 105 (1986).[11]
El concepto de "culpa", recogido en el Artículo 1802, ante,
es infinitamente abarcador, tanto como lo pueda ser la
conducta humana. H. Brau del Toro, Los daños y perjuicios
extracontractuales en Puerto Rico, ante, Cap. I, sec. 1.06.
En virtud de ello, hemos reconocido que el referido concepto
incluye cualquier falta de una persona que produce un mal
o daño. Leyva v. Aristud, 132 D.P.R. 489 (1993); Colón v.
Romero Barceló, 112 D.P.R. 573 (1982); Reyes v. Sucn. Sánchez
Soto, 98 D.P.R. 305 (1970).

Así pues, es ilícita la conducta o el acto, "en el
sentido extracontractual, cuando viola los deberes
generales de corrección o de conducta correcta, deberes que
no están escritos en los códigos pero que representan el
presupuesto mínimo sobreentendido del orden de la vida
social." Ramos v. Carlo, 85 D.P.R. 353, 359 (1962).
"Cualquier acto que esté en conflicto con la conducta que
debe observar un individuo en la comunidad en que convive
será ilícito y dará lugar a una acción en daños y perjuicios."
H. Brau del Toro, Los daños y perjuicios extracontractuales
en Puerto Rico, ante, Cap. I, sec. 1.06, a la pág. 7.

De otra parte, el Artículo 1803, 31 L.P.R.A. sec. 5142,
dispone, en lo aquí pertinente, que la obligación que impone
el Artículo 1802, ante, es exigible, no sólo por los actos
u omisiones propios, sino que por los de aquellas personas
de quienes se debe responder; ello, si existe un nexo

---

[11]    Véase además, como referencia, a J. L. Lacruz, Elementos

jurídico previo entre el causante del daño y el que viene obligado a repararlo. <u>Sánchez Soto v. E.L.A.</u>, 128 D.P.R. 497 (1991). <u>Así, entre otros, es responsable el Estado por los perjuicios causados por sus empleados en ocasión de sus funciones, siendo responsable, además, en ese concepto, en las mismas circunstancias y condiciones en que sería responsable un ciudadano particular</u>. Artículo 1803, ante. De esa manera, se reconoce la responsabilidad del Estado a base de la doctrina de la responsabilidad vicaria. Señala la propia disposición de ley que la responsabilidad de que trata este artículo cesará cuando las personas en él mencionadas prueben que emplearon toda la diligencia de un buen padre de familia para prevenir el daño.[12]

Ello no obstante, la responsabilidad que regula el citado artículo de ley, <u>con particular referencia a la impuesta al Estado</u>, se encuentra <u>restringida y limitada</u> a su vez por las disposiciones de la Ley de Reclamaciones y Demandas contra el Estado. 32 L.P.R.A. sec. 3077 et. seq.[13] Como es sabido, mediante la aprobación de tal estatuto, el

---

de Derecho Civil, Barcelona, Ed. Bosch, 1979, T.III, Vol. I.

[12] A base de esta disposición estatutaria se establece "una presunción legal de culpabilidad de las personas citadas en él, pues, en razón a las relaciones de autoridad o superioridad que mantienen con los autores del daño causado, la ley presume que le es imputable la causa del mismo por su propia culpa o negligencia, considerándoles como autores morales de dicho daño por no haber puesto de su parte el cuidado o la vigilancia necesaria para evitar que aquellos dieran lugar a él." Carlos J. Irizarry Yunqué, <u>Responsabilidad Civil Extracontractual</u>, 4ta Ed. Rev., San Juan, Facultad de Derecho, Universidad Interamericana de Puerto Rico, 2000, a la pág. 550.

[13] Mejor conocida por la Ley de Pleitos contra el Estado, Ley Núm. 104 de 29 de junio de 1955.

Estado renunció parcialmente su inmunidad, permitiendo ser demandado cuando sus agentes o empleados, por descuido, negligencia o falta de circunspección, ocasionan daños. En virtud de la referida Ley, se establecen, además, ciertas limitaciones a la renuncia de inmunidad del soberano. En esencia, la Asamblea Legislativa autorizó la presentación de demandas contra el Estado por las actuaciones culposas o negligentes de sus empleados, funcionarios o agentes en el desempeño de sus funciones y actuando en capacidad oficial [14]; también autoriza demandas fundadas en la Constitución, en cualquier ley o reglamento de Puerto Rico, o en algún contrato con el Estado.

El Artículo 2(a) de la referida Ley, específicamente dispone, en lo pertinente, que el Estado Libre Asociado de Puerto Rico podrá ser demandado ante el Tribunal de Primera Instancia en acciones por daños y perjuicios ocasionados a la persona o a la propiedad, causados por acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo interviniendo

---

[14] Sobre tales aspectos cabe destacar lo reseñado por este Tribunal en Romero Arroyo v. E.L.A., 127 D.P.R. 724 (1991) en cuanto al referido manto de inmunidad, a saber, al amparo de la doctrina de inmunidad del soberano, el Estado no puede ser demandado en sus propios tribunales, ni en otros, sin su consentimiento o permiso. Tradicionalmente la jurisprudencia de todos los países con sistemas de derecho desarrollados ha catalogado la inmunidad del Estado contra demandas como un principio jurídico establecido. Actualmente, no obstante, la doctrina sufre de una gran erosión. Las razones sobre las que descansa la inmunidad del soberano han sido objeto de mucho debate. Varían desde el axioma monárquico de "the king can do

culpa o negligencia. 32 L.P.R.A. sec. 3077 (a). Por otra parte debe mantenerse presente que, aun cuando el Estado haya renunciado a su inmunidad en casos de negligencia, éste conserva dicha inmunidad cuando la actuación del agente o funcionario constituye delito.

De conformidad con ello, para que la persona que reclama responsabilidad al Estado pueda prevalecer en un pleito en daños y perjuicios en contra de este último, ya sea por las acciones afirmativas o por las omisiones de un empleado, agente o funcionario, es necesaria la concurrencia de ciertos elementos. Véase: Leyva v. Aristud, ante. En primer lugar, la persona del demandante tiene el deber de probar que aquél que le causó el daño, era agente, funcionario o empleado del Estado; añadido al hecho de que tal agente, funcionario o empleado estuviese actuando en su capacidad oficial al momento de causarle el mismo. En segundo término, tiene que establecer un nexo jurídico suficiente entre la actuación negligente del alegado responsable y los intereses del Estado, esto por razón del ejercicio de funciones expresas o implícitas. Id.; Sánchez Soto v. E.L.A., 128 D.P.R. 497, 506 (1991). Es menester que pruebe, además, que el agente, empleado o funcionario actuó dentro del marco de su función. Por último, el demandante tiene que establecer que la actuación de aquél fue negligente y no intencional, y la existencia de un nexo o relación causal

---

no wrong", hasta la justificación económica de proteger los recursos monetarios del Estado.

entre la conducta culposa y el daño producido. Véase Artículo 6 (d) de la Ley Núm. 104, ante, 32 L.P.R.A. sec. 3081 (d).

Es de notar que en cada ocasión en que hemos tenido la oportunidad de evaluar las disposiciones de la Ley de Reclamaciones y Demandas contra el Estado, hemos acudido a las normas generales que sobre la culpa y negligencia se han expuesto en materia de la responsabilidad extracontractual. En cuanto a los daños hemos señalado, en términos generales, que "'daño' es todo aquel menoscabo material o moral que sufre una persona, ya sea en sus bienes vitales naturales, ya en su propiedad o patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra." Santini Rivera v. Serv. Air, Inc., 137 D.P.R. 1, 7 (1994).[15] Habida cuenta de ello, el concepto o término del "acto culposo o negligente" se caracteriza por ser uno sumamente amplio. Precisa destacar que nuestra jurisprudencia lo ha reconocido como la fuente de obligaciones de mayor alcance en nuestro ordenamiento. Es nuestro deber pues interpretarlo utilizando un criterio bastante abarcador, ya que, según mencionamos previamente, de eso se trata el concepto de la culpa, de aquel infinitamente abarcador como suele ser la propia conducta humana.[16]

---

[15]    Véase además, García Pagán v. Shiley Caribbean, 122 D.P.R. 193, 205-206 (1988); J. Santos Briz, La responsabilidad civil, derecho sustantivo y derecho procesal, 2da Ed. Rev., Madrid, Ed. Montecorvo, 1977, p. 126; M. Albaladejo, Comentarios al Código Civil y compilaciones forales, Madrid, Ed. Edersa, 1984, T. XXIV, p. 156.

[16]    Hemos afirmado además que "el concepto de culpa incluye todo tipo de transgresión humana tanto en el orden legal como

Así, no hemos tenido reparo en advertir reiteradamente que la culpa o negligencia es la falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, que una persona prudente habría de prever en las mismas circunstancias. <u>Toro Aponte v. E.L.A.</u>, 142 D.P.R. 464 (1997); <u>Ramos v. Carlo</u>, ante.[17] Una y otra vez hemos señalado que la culpa consiste en  la omisión de la <u>diligencia exigible</u> mediante cuyo empleo podría haberse evitado el resultado dañoso. "La diligencia exigible es la que cabe esperar del ser humano medio, el buen *pater familias*. Si el daño es previsible por éste hay responsabilidad. Si no es previsible estamos generalmente en presencia de un caso fortuito." <u>Toro Aponte v. E.L.A.</u>, ante, a la pág. 473; <u>Jiménez v. Pelegrina Espinet</u>, 112 D.P.R. 700, 704 (1982).

El elemento de la previsibilidad está íntimamente ligado al concepto de la causalidad. Debemos recordar que siempre hemos advertido que no basta que concurra un daño y una acción u omisión negligente. Para que se genere algún

---

en el moral." <u>Santini Rivera v. Serv. Air, Inc.</u>, ante, a la pág. 8; para luego destacar que incluye cualquier falta de una persona que produce un mal o daño "...la culpa tiene...naturaleza proteiforme; cambia como cambia el parecer de los hombres según las circunstancias de lugar y tiempo...esta flexibilidad del concepto de la culpa es deseable; de otro modo se anquilosaría el derecho de la responsabilidad extracontractual." Id., a la pág. 9; citando a <u>Colón v. Romero</u>, ante, a la pág. 579; <u>Gierbolini v. Employers Fire Ins. Co.</u>, 104 D.P.R. 853, 860 (1976).

[17]   Véase, además, <u>Gierbolini v. Employers Fire Ins. Co.</u>, ante; <u>Valle v. Amer. Inter. Ins. Co.</u>, 108 D.P.R. 692 (1979); <u>Elba A.B.M. v. U.P.R.</u>, 125 D.P.R. 291 (1990); <u>J.A.D.M. v. Centro Comercial Plaza Carolina</u>, 132 D.P.R. 785 (1993).

tipo de responsabilidad, es imperativa la existencia de un nexo causal entre el daño y el acto culposo o negligente. Toro Aponte v. E.L.A., ante; Monllor Arzola v. Sociedad, 138 D.P.R. 600 (1995). Cónsono con lo anterior, no hemos vacilado en reiterar la aplicación de la teoría de la causalidad adecuada al evaluar si, de hecho, existe algún tipo de relación entre el daño causado y el acto generador del mismo, como para imponerle responsabilidad a la persona que lo llevó a cabo. Conforme tal teoría, "no es causa toda condición sin la cual no se hubiera producido el daño, sino la que ordinariamente lo produce según la experiencia general." Toro Aponte v. E.L.A., ante, a la pág. 474; Soto Cabral v. E.L.A., 138 D.P.R. 298 (1995); Miranda v. E.L.A., 137 D.P.R. 700 (1994). "Un daño parece ser el resultado natural y probable de un acto negligente si después del suceso, y mirando retroactivamente el acto que se alega ser negligente, tal daño aparece como la consecuencia razonable y ordinaria del acto." Toro Aponte v. E.L.A., ante, a la pág. 474.

En esencia, la parte a quien se le imputa haber sido negligente puede ser responsable de todo aquel daño que parezca ser una consecuencia natural y probable de su acto u omisión. Ello por razón de que la acción culposa o negligente  ciertamente supone la infracción de alguna norma ya proveniente de la ley, de algún contrato o ya lesione principios jurídicos "superiores"  incluyendo todo aquel

"atentado a las buenas costumbres". <u>Santini Rivera v. Serv. Air, Inc.</u>, ante, a la pág. 9.[18]

Por último, debe recordarse que uno de los derechos básicos,   de mayor envergadura en nuestro ordenamiento y que la propia Constitución del Estado Libre Asociado de Puerto Rico reconoce al ser humano, <u>es el derecho a la libertad</u>. Se reconoce como <u>derecho fundamental</u> del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. Ciertamente la detención de un individuo conlleva la restricción de su libertad física. La violación de ese derecho fundamental repercute en la honra y reputación de la persona detenida.[19] Sabido es que la dignidad del ser humano es inviolable y que toda persona tiene derecho a la protección de la ley contra ataques abusivos a su honra, reputación, y a su vida privada o familiar.[20] Como máximos intérpretes de la ley en nuestra jurisdicción tenemos el deber, sino la obligación, de velar porque a todo ser humano en esta jurisdicción se le respeten los derechos básicos consagrados en la Carta de Derechos de nuestra Constitución.

**III**

---

[18]    Citando a J. Santos Briz, <u>La responsabilidad civil: derecho sustantivo y derecho procesal</u>, 3ra ed. 1981, p.26.

[19]    Antonio J. Amadeo-Murga, <u>El valor de los daños en la responsabilidad civil</u>, Tomo II, San Juan, Editorial Esmaco, 1997.

Sección 7, Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.

[20]    Sección 8, Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.

No hay duda alguna sobre el hecho de que el Estado, en representación y protección de la ciudadanía, no sólo tiene el deber y la obligación sino que el derecho de llevar a cabo todas las gestiones que resulten necesarias para combatir la criminalidad; ello, naturalmente, dentro de un marco de legalidad y razonabilidad.

Respecto a la identidad del responsable de la comisión de unos hechos delictivos, de ordinario y en la mayoría de los casos, la persona responsable es identificada por nombre y apellido, sin problema alguno; ello por razón de que la misma es conocida por los testigos oculares de los hechos que se le imputan. Hay otras situaciones en que la referida persona, a pesar de que es observada por los testigos de los hechos delictivos por él cometidos, no es conocida por éstos; situación que hace necesario que dicha persona sea identificada por otros métodos, entre éstos, la identificación por fotografías y la llamada "rueda de detenidos", que regula la Regla 252.1 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 252.1.

Estos métodos han sido establecidos, precisamente, en protección de la ciudadanía en general. El establecimiento de dichos métodos tiene el fin principal de evitar, hasta donde ello sea humanamente posible, que se prive de su libertad a una persona inocente, esto es, se arreste, se juzgue y encarcele a una persona que no tiene nada que ver con unos hechos delictivos cometidos.

Ahora bien, la existencia y la "sofisticación" de ciertas actividades criminosas, las cuales se llevan a cabo en la clandestinidad, ha hecho necesario que el Estado utilice el llamado "agente encubierto", el cual es un agente del orden público que, haciéndole creer a los miembros de la organización criminosa que él también es un delincuente, se infiltra en la referida organización con el propósito de, una vez cuente con la evidencia suficiente, traer a éstos ante nuestro sistema de justicia criminal para que respondan por sus actuaciones criminosas. Véase: Pueblo v. Cruz Calderón, resuelto el 16 de enero de 2002, 2002 TSPR 5.

En ocasiones, a este agente encubierto le resulta fácil el poder descubrir, y precisar, los nombres verdaderos y hasta las direcciones donde pueden ser localizados los miembros de la organización criminosa. En otras ocasiones, ello le resulta imposible; únicamente pudiendo identificar a éstos por su apodos y por una certera descripción física.

En estas últimas situaciones, los miembros de la agencia investigadora tienen que asegurarse de tomar todos los pasos necesarios para poder identificar, de forma certera y correcta, al delincuente que llevó a cabo la transacción delictiva con el agente encubierto. Hay varias formas de hacerlo. Entre otras --y sin pretender ser exhaustivos-- los agentes supervisores del agente encubierto pueden tomar fotos, a distancia, de la persona involucrada en el acto criminal; pueden éstos agentes seguir al delincuente hasta su residencia y lugar de trabajo;

pueden, en compañía del encubierto y protegiendo la identidad de éste, lograr que, a distancia, dicho agente les identifique a la persona; y, como mínimo y en la situación en que no se haya podido identificar plenamente al delincuente con anterioridad, el día en que se lleve a cabo el arresto de dicha persona  --día en que ya <u>no</u> existe razón alguna para seguir protegiendo la identidad del agente encubierto-- éste <u>tiene</u> que estar presente para poder identificar o señalar a la persona que va a ser arrestada.

Este procedimiento de identificación pre-arresto, en nuestro criterio, <u>resulta ser de gran envergadura e importancia</u>. Ello así ya que no podemos olvidar que, en esta clase de situaciones, <u>está en juego el derecho a la libertad de nuestros conciudadanos, derecho constitucionalmente protegido</u>. Sección 7 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico. Ello nos obliga a establecer un <u>justo y apropiado balance</u> entre el derecho del Estado a actuar de forma vigorosa en la investigación, y procesamiento, de las causas criminales y el derecho a la libertad de nuestros conciudadanos, derecho del más alto rango constitucional en nuestra jurisdicción.

IV

Los hechos del presente caso no están en controversia, tampoco los daños causados. Las determinaciones de hecho emitidas por el foro de instancia no han sido cuestionadas por ninguna de las partes. Incluso, los hechos esenciales han sido admitidos y estipulados. Cabe destacar que los

agentes envueltos  aceptaron el hecho de que cometieron "errores" en el proceso de identificación del sospechoso.

Un examen desapasionado de los referidos hechos --los cuales, repetimos, no están en controversia-- demuestra que los agentes del N.I.E. involucrados en el operativo que resultó en el arresto y encarcelación ilegal del peticionario Valle Izquierdo realmente no cumplieron cabalmente con la obligación que le imponía la situación que tenían ante su consideración. De hecho, dicho análisis demuestra que éstos agentes tomaron el "camino más fácil"; esto es, llevaron a cabo, como para "salir del paso", una gestión extremadamente mínima en el proceso de identificación que tenían la obligación de realizar a cabalidad. La misma consistió, como hemos visto, en anotar la tablilla de un vehículo de motor, cotejar con el Departamento de Transportación y Obras Públicas a quién le pertenecía dicho vehículo de motor, y enseñarle la fotografía de dicha persona al agente encubierto.

Recordaremos que dicho agente encubierto, al serle mostrada dicha foto, les informó a sus supervisores que la persona que mostraba la misma tenía un cierto parecido con la persona con quien había realizado la transacción de drogas. Ese hecho, esa contestación, debió servirle de aviso o alarma, esto es, debió ser suficiente para que dichos agentes supervisores llevaran a cabo gestiones adicionales para asegurarse de que se trataba de la persona correcta.

No podemos permitir que en nuestra jurisdicción se prive de su libertad a una persona meramente porque la misma tiene un "cierto parecido" con el responsable de un acto criminoso. El agente del orden público que así actúa no incurre en un mero error; el que así actúa incurre en negligencia, viniendo el Estado en la obligación de resarcir los daños que dicha actuación negligente cause. Precisamente por los derechos envueltos, dichos agentes tenían la obligación de llevar a cabo su trabajo de manera diligente, ejercerlo con el debido cuidado, circunspección, cautela, vigilancia y precaución que las circunstancias exigían. H. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, ante, a la pág. 174.

Somos del criterio que si los agentes involucrados en el presente caso hubieran actuado con la diligencia debida, el daño causado nunca hubiera ocurrido. Resulta evidente, a nuestro juicio, que la negligencia en que incurrieron los agentes, en el proceso de identificación del peticionario Valle Izquierdo, fue precisamente la causa del arresto y encarcelamiento ilegal de éste y, por ende, de los daños sufridos por dicha peticionario y su señor padre. Romero Arroyo v. E.L.A., 127 D.P.R. 724 (1991). Sabido es que la culpa o negligencia es la falta de debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto que una persona prudente habría de prever en las mismas circunstancias. Toro Aponte v. E.L.A., 142 D.P.R. 464 (1997); Ramos v. Carlo, ante.

Ciertamente ello se pudo haber evitado además si, en el curso del operativo, el agente encubierto hubiera estado presente para identificarlo propiamente. No podemos perder de perspectiva que estamos ante una persona que estuvo sujeta a responder ante las autoridades judiciales como un supuesto traficante de drogas, ello desde su arresto hasta la celebración de la vista preliminar en su contra. Es allí cuando, de repente, el agente se percata, al verlo de cerca por primera vez desde la investigación, de que esa no era la persona que en realidad cometió las infracciones a la Ley de Sustancias Controladas.

En un justo y apropiado balance de los intereses aquí encontrados, no podemos cegarnos ante lo ocurrido al peticionario. En esencia, es nuestro deber tratar de equiparar el derecho a ser compensado que tiene el ciudadano que resulta perjudicado por la actuación culposa o negligente de un agente del Estado y, el interés o, más bien, deber que tienen las autoridades gubernamentales de actuar de forma vigorosa en la investigación de las causas criminales. Ello, sin embargo, no opera como una "carta blanca" para que, en el ejercicio de tales funciones, los agentes del orden público vulneren los derechos más básicos y fundamentales que nuestra Constitución y nuestro ordenamiento le garantizan a todo ser humano.

En fin, el resultado dañoso ocurrido en el presente caso es uno que pudo haber sido previsto y evitado. <u>Toro Aponte v. E.L.A.</u>, ante; <u>Jiménez v. Pelegrina Espinet</u>, 112 D.P.R.

700 (1982). "Para que haya negligencia basta con que el resultado haya sido previsto como posible o hubiese tenido que ser previsto." H. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, ante, a la pág. 174. No albergamos duda alguna de que, al evaluar el daño causado al demandante, y mirar retroactivamente la actuación negligente de los agentes, precisamente tales daños sufridos aparecen como consecuencia razonable de dichos actos. Toro Aponte v. E.L.A., ante, a la pág. 474.

En otras palabras, resulta meridianamente claro que era razonablemente probable y previsible que --si no se identificaba correctamente a la persona que realmente había cometido los hechos delictivos-- ocurriera lo que desafortunadamente ocurrió en el presente caso, a saber: que se arrestara y encarcelara a una persona inocente.

V

En virtud de lo antes expuesto, procede decretar la revocación de las sentencias emitidas en el presente caso tanto por el Tribunal de Circuito de Apelaciones como por el Tribunal de Primera Instancia, desestimatorias de la demanda radicada por la parte peticionaria; devolviéndose el caso al foro de instancia para que éste proceda, de inmediato, a realizar una justa evaluación de los daños y perjuicios sufridos por los demandantes Arnold Valle Izquierdo y Arnold Valle Ortiz.

Se dictará Sentencia de conformidad.

**FRANCISCO REBOLLO LOPEZ**
**Juez Asociado**

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Arnold Valle Izquierdo
Arnold Valle Ortiz

    Demandantes-peticionarios

       vs.                         CC-2000-923      CERTIORARI

Estado Libre Asociado de
Puerto Rico, et als.

    Demandados-recurridos

SENTENCIA

San Juan, Puerto Rico, a 14 de mayo de 2002

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de las emitidas en el presente caso tanto por Tribunal de Circuito de Apelaciones como por el Tribunal de Primera Instancia, desestimatorias de la demanda radicada por la parte peticionaria; se declara con lugar la demanda radicada; y se devuelve el caso al foro de instancia para que éste proceda, de inmediato, a realizar una justa evaluación de los daños y perjuicios sufridos por los demandantes Arnold Valle Izquierdo y Arnold Valle Ortiz.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri disiente sin opinión escrita.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo