# United States Court of Appeals
## For the First Circuit

No. 09-2406

SILVIO SOLIS-ALARCÓN, MIGDALIA MÁRQUEZ ROBERTO,
CONJUGAL PARTNERSHIP SOLIS-MÁRQUEZ,

Plaintiffs, Appellants,

v.

UNITED STATES; FELTON CAMERON, Special Agent;
GREGG CALAM, Special Agent; JULIO C. ABREU LORA;
OSVALDO ALVARADO MIRANDA; AMARILIS CENTENO RAMOS;
JULIA CENTENO RAMOS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before
Boudin, Selya and Lipez,
Circuit Judges.

Luis A. Meléndez-Albizu and Law Offices of Luis A. Meléndez-Albizu on brief for appellants.
Tony West, Assistant Attorney General, Rosa E. Rodriguez-Velez, United States Attorney, Barbara L. Herwig and Edward Himmelfarb, Appellate Staff, Civil Division, Department of Justice, on brief for appellees.

November 23, 2011

**BOUDIN, Circuit Judge**. Early on the morning of September 18, 2003, agents of the Drug Enforcement Agency ("DEA") and Puerto Rico police officers working as part of a joint federal-state task force went to the residence at #I-17 Alondra St., Brisas de Canóvanas, Puerto Rico. Whether this address is technically in Carolina or the adjacent town of Canóvanas is not clear. One officer knocked on the door, which was opened by the home's owner, Silvio Solis-Alarcón. Solis-Alarcón says that the officers, wielding guns, then entered the home without obtaining his consent.[1]

The officers were there to arrest Juan Díaz-Suazo. From intercepts and surveillance, the members of the task force had ample reason to believe that Díaz-Suazo had engaged in drug transactions as a member of a major drug ring, and a warrant had been issued for his arrest. The agents aimed to arrest Díaz-Suazo on the same day that, in accordance with an operational plan, numerous other members of the drug ring were to be taken into custody.

The DEA agents' belief that they would find Díaz-Suazo at #I-17 Alondra Street rested on events that occurred earlier in the year. In April 2003, task force officers identified Díaz-Suazo as driving a red Dodge Durango in the course of a drug transaction,

---

[1]The agents say that they had consent to enter and search the house; but that is a disputed issue so at this stage we assume arguendo that no consent was given.

pulled him over to identify him and the vehicle and examined his license. The vehicle turned out to be registered to plaintiff Silvio Solis-Alarcón at Calle Alon, Urb. Brisas de Canóvanas. At some point in September, officers on the task force made inquiries in the neighborhood of the address on Díaz-Suazo's license and concluded that he did not live at that address.

Puerto Rico police officers working with the task force also reported that in September 2003 they had seen Díaz-Suazo drive the same vehicle to Solis-Alarcón's house at #17 Alondra St., open the garage door or gate, park the vehicle and close the entrance.[2] The officers also reported that the garage door or gate door had been opened by Díaz-Suazo through some kind of automatic or electronic device. The officers remained outside for about 30 minutes; no one emerged from the house or garage.

Although the DEA agents who entered the house on September 23, 2003, had a valid arrest warrant for Díaz-Suazo, they had no warrant to search the house. DEA agents Felton Cameron and Greg Calam questioned Solis-Alarcón and his wife Migdalia Márquez-Roberto both of whom denied that Díaz-Suazo lived at the house and said they did not know where he was. Solis-Alarcón then accompanied the officers as they conducted a 15 to 20 minute search

_____

[2]Solis-Alarcón claims that these events took place on a single day in April, but the relevant declarations make clear that police undertook the surveillance of the house after determining that Díaz-Suazo did not live at the address listed on his license.

-3-

of the house while his wife remained in the living room answering questions. Díaz-Suazo was not found in the house but the agents did seize the Dodge from the garage as one that had been used in a drug crime, although it was later returned as failing to meet the minimum value warranting forfeiture under DEA policy.

Two years later, in September 2005, Solis-Alarcón and his wife filed this action seeking $6 million for emotional distress and punitive damages stemming from the search. The amended complaint asserted Fourth Amendment claims against the two DEA agents named above, based on Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), and tort claims against the United States for the agents' conduct asserted under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680 (2006).[3]

After discovery, the government and the agents sought summary judgment. In September 2007, the district court granted summary judgment for the agents on the Bivens claims, concluding that the agents were protected by qualified immunity. The court later dismissed the FTCA claims, reasoning that its Bivens analysis negated the fault element required for tort recovery under Puerto Rico law. These two legal rulings, which we review de novo, are

[3]Claims of constitutional violations by state officers under 42 U.S.C. § 1983 and claims of tort liability against state officers under Puerto Rico law were dismissed for want of timely prosecution and are not pursued on this appeal.

-4-

the focus of the present appeal and we start with the Bivens claims.

It is settled Fourth Amendment law that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980). Conversely, absent exigency or consent, an officer may not search a third-party's residence on the basis of an arrest warrant without having a search warrant for the premises. Steagald v. United States, 451 U.S. 204, 205-06 (1981).

What, then, if the police are mistaken as to the subject's residence? Our own position, conforming to that of most other circuits, is that no Fourth Amendment violation occurs if officers enter a third party's home under the reasonable belief that the target named in the arrest warrant resides at the dwelling in question and will be present at the time of the entry. United States v. Werra, 638 F.3d 326, 336-37 (1st Cir. 2011); United States v. Graham, 553 F.3d 6, 12-13 (1st Cir.), cert. denied, 129 S. Ct. 2419 (2009).[4]

It is clear that a reasonable belief requires something more than "suspicion," but, even with the more demanding "probable

---

[4]Accord, United States v. Cantrell, 530 F.3d 684, 690 (8th Cir. 2008); United States v. Thomas, 429 F.3d 282, 286 (D.C. Cir. 2005), cert. denied, 549 U.S. 1055 (2006); United States v. Lovelock, 170 F.3d 339, 343-44 (2d Cir.), cert. denied, 528 U.S. 853 (1999).

-5-

cause" test used for arrests, the Supreme Court has not used a numerical formula. Rather, it has asked whether, given the information available, a reasonably prudent man could believe that the defendant had committed the crime. Beck v. Ohio, 379 U.S. 89, 91 (1964). So, too, the reasonableness inquiry here is whether the agents could reasonably believe that Díaz-Suazo lived at the house (and so would likely be present there in the early morning).

Federal officers sued for damages in a Bivens action, like state officers sued under 42 U.S.C. § 1983, Wilson v. Layne, 526 U.S. 603, 609 (1999), have a further layer of protection available to them, namely, qualified immunity where the officer acted in the absence of guidance "sufficiently clear that a reasonable official" would understand that he was violating a right. Anderson v. Creighton, 483 U.S. 635, 640 (1987). Qualified immunity applies not only to the question whether a constitutional right exists but also to the judgment whether the general standard applies to the facts at hand. Saucier v. Katz, 533 U.S. 194, 204-05 (2001).

This extra layer of protection does not disappear merely because the underlying Fourth Amendment standard is itself one of reasonableness. The Supreme Court has drawn attention to the potential confusion, Saucier, 533 U.S. at 203-205 ("reasonable mistakes"); Anderson, 483 U.S. at 643-44 (possible to 'reasonably' act unreasonably); but, in the end, qualified immunity against

-6-

personal liability exists even for constitutional mistakes and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The Fourth Amendment standard is objective, United States v. Proctor, 148 F.3d 39, 42 (1st Cir. 1998), and, where qualified immunity is asserted, the district judge may apply it on summary judgment so long as any disputed facts are assumed arguendo in favor of the non-moving party. Lopera v. Town of Coventry, 640 F.3d 388, 395-96 (1st Cir. 2011). But, apart from consent, which we have assumed was lacking, plaintiffs have not seriously countered the DEA agents' version of the facts, especially their description of what they knew and how they knew it.

This description establishes that Calam, Cameron and the two police officers on the task force who furnished the information described above all worked together. The DEA agents were entitled to rely on plausible information supplied to them by fellow officers, cf. United States v. Hensley, 469 U.S. 221, 232-33 (1985), and here the latter were themselves federally deputized on the task force. "[W]here law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all." Illinois v. Andreas, 463 U.S. 765, 771 n.5 (1983).

In a nutshell, the DEA agents had evidence that Díaz-Suazo was twice seen using a vehicle registered to Solis-Alarcón and parked at the latter's house; that Díaz-Suazo had access to the garage and presumably the house; and that Díaz-Suazo did not live at the address set out in his driver's license. Perhaps, too, they could place weight on the judgment of the local officers that Díaz-Suazo lived at #17 Alondra St. And, if he did live there, it would be reasonable to believe him in residence early in the morning.

The judgment that he did live there would perhaps be a close call if the issue before us were whether evidence seized in the search should be suppressed. In many like search cases, the police had more potent evidence of residence, such as statements of the subject himself, extensive records linking the person to the address, or a combination of a reliable tip, a recent police report, and a contemporaneous witness identification.[5] See also Werra, 638 F.3d at 337 ("doubt[ing]" that an informant's tip could support a reasonable belief that suspect lived in a rooming house).

However, such searches have occasionally been upheld on thinner evidence, such as an anonymous tip combined with a statement from a seemingly untrustworthy informant, United States v. Pruitt, 458 F.3d 477, 481-83 (6th Cir. 2006), cert. denied, 549 U.S. 1283 (2007). Cf. Thomas, 429 F.3d at 285-86. And, if there

---

[5]United States v. Risse, 83 F.3d 212, 214-15 (8th Cir. 1996); United States v. Route, 104 F.3d 59, 61-63 & n.1 (5th Cir.), cert denied, 521 U.S. 1109 (1997); Graham, 553 F.3d at 13.

was error at all in the present case, it was not so egregious as to defeat qualified immunity. Assuming that the agents' judgment was unreasonable, it was not "manifestly unreasonable." Ringuette v. City of Fall River, 146 F.3d 1, 5 (1st Cir. 1998).

As for the search that occurred after entry, the government invokes Maryland v. Buie, 494 U.S. 325 (1990), to justify a protective sweep. The officers were not required to accept plaintiffs' word that Díaz-Suazo was absent, Buie, 494 U.S at 330; there was clear evidence that their vehicle had been used in a drug deal by a man who recently had access to the premises. A search, limited to places where Díaz-Suazo might reasonably be hiding, was equally covered by qualified immunity.

While the search was being completed, Solis-Alarcón accompanied the officers and his wife answered questions in the living room; plaintiffs have suggested that this constituted an unlawful detention and have also said that officers opened kitchen drawers and looked through their mail, which would need explaining. However, the plaintiffs have not developed the detention issue on appeal and the scope of the search is raised only in the reply brief and so is forfeited. United States v. Sacko, 247 F.3d 21, 24 (1st Cir. 2001).

This brings us to the FTCA claim against the United States. Under the FTCA, the federal government

> waives its sovereign immunity for 'injury or
> loss of property . . . caused by the negligent

> or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'

Abreu-Guzmán v. Ford, 241 F.3d 69, 75 (1st Cir. 2001) (quoting 28 U.S.C. § 1346(b)(1)).

In substance, the FTCA adopts respondeat superior liability for the United States and, while it exempts intentional torts from the sovereign immunity waiver, 28 U.S.C. § 2680(h), it expressly allows actions for claims of "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" arising out of "acts or omissions of investigative or law enforcement officers of the United States Government."  Id. Like the government, we will assume that any wrongdoing incident to the search falls within the waiver as a false imprisonment. Cf. Unus v. Kane, 565 F.3d 103, 117 (4th Cir. 2009), cert. denied, 130 S. Ct. 1137 (2010).

The district judge, finding that the "federal defendants exercised due care" and had been reasonable, rejected the FTCA claims that the agents would be liable under Puerto Rico tort law. Solis-Alarcón responds that Puerto Rico stringently protects privacy and does not recognize qualified immunity.  He suggests that a Puerto Rico court would hold the agents liable in tort and

that under the FTCA that liability has been assumed by the United States.

Puerto Rico imposes liability for fault or negligence that causes injury, P.R. Laws Ann. tit. 31, § 5141 (2010), but protecting law enforcement agents for reasonable mistakes is common, Unus, 565 F.3d at 117; Villafranca v. United States, 587 F.3d 257, 261 (5th Cir. 2009), and in at least two decisions, this court assumed that Puerto Rico tort law would not impose personal liability for mistaken arrests where the officers would be protected in Bivens claims by qualified immunity. Rodriguez v. United States, 54 F.3d 41, 45-47 (1st Cir. 1995); Abreu-Guzmán, 241 F.3d at 75-76.

For the most part, the Puerto Rico cases cited to us by Solis-Alarcón use standards that appear little different than our own Fourth Amendment decisions. E.g., Pueblo v. Rivera-Colon, 128 P.R. 672 (1991) (certified translation) (applying Steagald). Many are concerned not with civil liability of officers but with suppression of evidence.[6] One of the few cases dealing with civil

---

[6]E.g., Pueblo v. Santiago Alicea, 138 P.R. Dec. 230 (1995) (certified translation) (suppressing evidence where consent to search found invalid); Pueblo v. Narvaez Cruz, 21 P.R. Offic. Trans. 431, 436 (1988) ("It is a well-settled rule that a warrantless search or seizure is per se unreasonable"); Pueblo v. Malavé-González, 20 P.R. Offic. Trans. 487, 494 (1988) ("a warrantless search or seizure produces a presumption of nullity"). But see Quiñones v. Commonwealth 90 P.R.R. 791, 794 (1964); Vázquez Figueroa v. Commonwealth, 2007 TSPR 168 (2007) (certified translation).

liability of officers, <u>Valle Izquierdo</u> v. <u>Commonwealth</u>, 2002 TSPR 64 (2002) (official translation), albeit refusing to dismiss liability claims on much more egregious facts, spoke of the importance of the state's law enforcement function and the need

> to balance the right to compensation of a citizen who is injured by the wrongful or negligent acts of a state officer, and the interests or, better said, the duty of government authorities to act vigorously in the investigation of criminal causes.

<u>Id.</u> at 12. <u>See also</u> <u>id.</u> at 11 ("This compels us to strike a <u>fair and appropriate balance</u> . . . .).

This is the view that animates federal qualified immunity doctrine. <u>Harlow</u> v. <u>Fitzgerald</u>, 457 U.S. 800, 813-14 (1982). Were this not Puerto Rico's position, a significant question might arise whether any local court could impose damage liability on federal officers where they would be exempt in a federal lawsuit and whether Congress under the FTCA would expect the federal government to shoulder such liability. <u>See</u> <u>Caban</u> v. <u>United States</u>, 728 F.2d 68, 75 (2d Cir. 1984) (Friendly, J. concurring). Given <u>Rodriquez</u> and <u>Abreu-Guzmán</u>, these questions need not be pursued in this case.

Plaintiffs say that issues of Puerto Rico law should be certified to the Puerto Rico Supreme Court, but this request came too late and only after the district court rejected the FTCA claim. <u>See</u> <u>Boston Car Co.</u> v. <u>Acura Auto Div., Am. Honda Motor Co.</u>, 971 F.2d 811, 817 n.3 (1st Cir. 1992). A separate procedural claim has been considered but needs no discussion. An evidentiary claim is

forfeit because it was developed only in a footnote in the opening brief.  <u>Nat'l Foreign Trade Council</u> v. <u>Natsios</u>, 181 F.3d 38, 61 n.17 (1st Cir. 1999).

<u>Affirmed</u>.