ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| CARMEN TORRES RIVERA<br><br>Apelante<br><br>v.<br><br>UNIVERSAL INSURANCE COMPANY; ASOCIACIÓN DE CONDÓMINES CONDOMINIO THE EXECUTIVE; y P&P ALL MANAGEMENT CORP.<br><br>Apelados | KLAN202300668 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2017CV02513<br><br>Sobre:  Daños y Perjuicios |
| --- | --- | --- |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Salgado Schwarz y el Juez Ronda Del Toro

**Ronda Del Toro, Juez Ponente**

## SENTENCIA

En San Juan, Puerto Rico, a 30 de septiembre de 2024.

Compareció ante nosotros mediante recurso de apelación Carmen Torres Rivera (apelante), para solicitar la revisión de una sentencia enmendada emitida el 20 de junio de 2023 por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI o foro primario). En su recurso, presentado el 31 de julio de 2023, la apelante expuso que el 20 de diciembre de 2016, ella llegando y haciendo entrada al edificio de nombre The Executive, donde laboraba, sufrió una caída que le causó serias lesiones en su espalda y piernas, al punto que requirió intervención quirúrgica para corregir los daños a su columna vertebral y piernas.

Continuó reclamando la apelante que esos daños sufridos, se debieron a la caída, la cual, a su vez, se debió a la negligencia y las omisiones de la propietaria de las áreas comunes del inmueble, entiéndase la Asociación de Condómines del

Condominio The Executive (en adelante Condominio o The Executive) y de su administradora y proveedora de mantenimiento a las áreas comunes, P & P All Management Corp. (en adelante P & P). Reclamó además que, entre ambas codemandadas antes mencionadas, incurrieron en la negligencia que fue la causa próxima del accidente de la apelante, demandante en el TPI.

Comparecieron además en el caso, como aseguradoras de P & P y The Executive, Triple-S Propiedad (en adelante Triple S) y Universal Insurance Company (en adelante Universal), las que comparecieron junto a sus asegurados en el caso y negaron los reclamos de la demandante en su contestación a la demanda.

La apelante alegó en su demanda que el 20 de diciembre de 2016, mientras caminaba por el estacionamiento ubicado en la parte posterior del Condominio The Executive ("Condominio") sufrió una caída.  En específico, adujo que, luego de subir el primer tramo de escaleras que dan acceso al interior del Condominio, abrió la puerta, resbaló y cayó de espaldas contra el suelo. Señaló que la caída fue a causa de que el piso del edificio estaba mojado por filtraciones de agua en las paredes de las escaleras que dan acceso del estacionamiento al interior del edificio. Sostuvo que, como consecuencia de la caída, tuvo que recibir atención médica inmediata y ser sometida a una cirugía reconstructiva. La señora Torres Rivera reclamó una cantidad no menor de $500,000.00 por concepto de daños sufridos.

El 29 de enero de 2018, Universal presentó su *Contestación a Demanda.* En su escrito, aceptó haber expedido una póliza de seguros a favor de P&P. El 12 de abril de 2018, Triple S y Asociación presentaron su correspondiente *Contestación a Demanda*. En la misma, se acepta que Triple S expidió una póliza

de seguro a favor de Asociación y como defensa afirmativa sostienen que la acción incoada por la apelante se encuentra prescrita, por lo que solicitaron la desestimación de la demanda. Por su parte, P&P presentó *Contestación a Demanda* el 16 de abril de 2018. Esencialmente, negó las alegaciones de la parte apelante y enunció sus defensas afirmativas.

Luego de varios incidentes procesales que incluyó una intervención de este Tribunal de Apelaciones mediante el caso KLAN202000848, en el que se emite aquí una Sentencia confirmando la del TPI que declaraba Ha Lugar una Sentencia Parcial sacando a SSS del caso, se dan nuevos trámites en el caso.

Finalmente, se llevó a cabo el juicio los días 10 de febrero de 2023 y 16 de marzo de 2023. El último día de vista quedó sometido y se dictó Sentencia el 24 de abril de 2023, notificada al día siguiente 25 de abril de 2023 y contra esta se solicita Reconsideración y determinaciones de hechos por la demandante, los demandados en el TPI, aquí apelados, se opusieron y el TPI declaró no ha lugar la solicitud de Reconsideración y de determinaciones de Hechos Adicionales, pero acogió algunos y notificó una Sentencia Enmendada el 27 de junio de 2023.

El 31 de julio de 2023 se presenta esta Apelación por Carmen Torres Rivera como Apelante, contra dicha Sentencia Enmendada. Contra la Apelación la parte Recurrida presenta Moción de Desestimación y contra la misma la parte apelante se opuso. El 30 de agosto de 2023 se desestimó esta Apelación pues este panel interpretó que se habían incumplido los requisitos esenciales y ante ello se resolvió que nunca se perfeccionó el recurso.

La parte apelante presentó contra dicha Sentencia un Recurso de Certiorari ante el Tribunal Supremo de Puerto Rico, el cual se acogió por mayoría de sus miembros y el 19 de abril de 2024 se emite Sentencia en donde mayoría de miembros que componen dicho foro, revoca nuestra sentencia y se devuelve el caso a este foro para atenderlo en sus méritos, lo que aquí hacemos.

Aceptamos, por resolución del 1 de julio de 2024, que se presentara una transcripción estipulada por las partes, la que se recibió el 29 de julio de 2024. Luego el 19 de agosto de 2024 la parte Apelante presentó como alegato suplementario un escrito que tituló Recurso de Apelación y el 9 de septiembre de 2024, la parte recurrida presentó Alegato en Oposición a Apelación y el recurso quedó perfeccionado para ser resuelto.

Veamos con mayor detalle los hechos que dan lugar a este reclamo.

## I.

El 27 de noviembre de 2017, la Sra. Carmen Torres Rivera, aquí apelante, presentó una demanda por concepto de daños y perjuicios en contra de la Asociación de Condómines del Condominio The Executive (en adelante The Executive) y de su administradora y proveedora de mantenimiento a las áreas comunes, P & P All Management Corp. (en adelante P & P) y las aseguradoras de éstas Triple-S Propiedad (en adelante Triple S) y Universal Insurance Company (en adelante Universal), en conjunto recurridas, excepto Triple S que ya salió del caso.

A modo de resumen alegó la apelante que el 20 de diciembre de 2016, ella, llegando y haciendo entrada al edificio de nombre The Executive, donde laboraba, sufrió una caída en uno de los pasillos del Condominio cuando se dirigía a su lugar de trabajo,

debido a que el piso estaba mojado. Continuó alegando que la caída, le causó serias lesiones en su espalda y piernas, al punto que requirió intervención quirúrgica para corregir los daños a su columna vertebral y piernas más angustias emocionales. Continuó reclamando la apelante que esos daños sufridos, se debieron a la caída, la cual se debió a la negligencia y las omisiones de la propietaria de las áreas comunes del inmueble, entiéndase The Executive y P & P. Reclamó además que entre ambas codemandadas antes mencionadas incurrieron en la negligencia que fue la causa próxima del accidente de la apelante.

Luego de varios trámites judiciales, incluyendo la presentación de alegaciones responsivas de todos los demandados, entre los trámites se incluyó una intervención de este Tribunal de Apelaciones mediante el caso KLAN202000848, luego que el TPI emite una Sentencia Parcial declarando Ha Lugar una solicitud de Triple S, a los efectos de que se desestimara el reclamo en su contra. En ese trámite apelativo contra esta, se emite aquí una Sentencia confirmando la del TPI sacando a Triple S del caso.

Finalmente se celebra el juicio, que se llevó a cabo los días 10 de febrero de 2023 y 16 de marzo de 2023 y el TPI emite una Sentencia el 26 de junio de 2023, en la que determina que la señora Torres Rivera, aquí apelante, falló en establecer la negligencia de las Recurridas en cuanto a que existía una sustancia peligrosa en el piso y declaró no ha lugar la Demanda y ordenó su archivo con perjuicio.

En la Sentencia se detallan las siguientes Estipulaciones como adoptadas por las partes.

1. Se estipula que el lugar donde se alega que ocurrió el accidente por el cual se reclama es dentro del edificio Banco Cooperativo Plaza.

2. Se estipula que el mantenimiento del lugar donde ocurrió el accidente descrito en la demanda lo brindaba P&P Management, Corp. para el 20 de diciembre de 2016.

3. Se estipula que P&P Management Corp. tiene una póliza de responsabilidad pública emitida a su favor por Universal Insurance Company, vigente al 20 de diciembre de 2016, conforme a sus cláusulas, límites y condiciones.

4. Se estipula que Triple S Propiedad, Inc. expidió la póliza CP-81084723 a favor de la Asociación de Residentes de Condómines del Condominio vigente al 20 de diciembre de 2016, la cual está sujeta a sus cláusulas, límites y condiciones.

5. Se estipula la autenticidad de los expedientes médicos de la demandante de los cuales haya provisto copia certificada.

6. Autenticidad del contrato de servicios entre el Consejo de Titulares del Condominio The Executive con P&P All Management, Corp.

También, en la Sentencia el TPI emite las siguientes Determinaciones de Hechos:

1. La demandante, Carmen Palmira Torres Rivera, a la fecha de juicio tenía 66 años. Es retirada y beneficiaria del seguro social. Su último empleo fue con Oliver & Asociados, con quien trabajó desde 1994 hasta el 9 de noviembre de 2017 ya que la firma dejó de operar en Puerto Rico a esa fecha debido a la situación de falta de energía eléctrica que sufrió el país tras el paso del huracán María el 20 de septiembre de 2017. Las oficinas Oliver & Asociados ubicaban en The Executive Building, cuyo Consejo de Titulares es uno de los aquí codemandados.

2. La oficina donde trabajaba la demandante ubicaba en dicho edificio, piso 9, oficina 906.

3. El 20 de diciembre de 2016[1], la demandante sufrió una caída en el edificio The Executive Building. La demandante declaró que recuerda que estaba lloviendo desde la noche anterior y que, durante el trayecto de su residencia a la oficina, se mantuvo lloviendo[2]. Indicó que al llegar a su lugar de trabajo estacionó su auto en el lugar destinado para ello en el edificio, el cual no tiene techo. Se bajó del carro y tomó su cartera, una bolsa y su paraguas y se dirigió hacia el edificio para entrar por la parte trasera, que es la que da acceso del estacionamiento al interior del edificio. La cartera la colocó en su hombro izquierdo, la bolsa en su muñeca izquierda y el paraguas en su mano derecha[3]. Hizo referencia al Exhibit 1, estipulado, que muestra el área del estacionamiento.

4. La demandante testificó que llevaba su cartera en su hombro izquierdo y una bolsa en su muñeca izquierda. También llevaba su paraguas en su mano derecha. Calzaba zapatos bajos de suela de goma y procedió a abrir la puerta hacia el interior del edificio. Utilizó su llave, cerró la sombrilla y la sacudió hacia afuera y comenzó a subir las escaleras interiores hacia la otra puerta del segundo nivel. Véase Exhibit 1 (h-8), estipulado. Ya en el segundo nivel, entró al pasillo, y según su declaración, dio 4 ó 5 pasos[4] y "me voy al aire, resbalé". Señaló, "...caí reventá... La demandante testificó que resbaló porque el piso estaba mojado. Sin embargo, al ser cuestionada de cómo sabía que el piso estaba mojado, esta indicó que concluyó eso toda vez que su ropa estaba mojada.

---

[1] Se corrige esta parte de la Sentencia toda vez que la declaración de la demandante fue que dio de 4 a 5 pasos y no de 3 a 4 pasos, como se dispuso en la Sentencia previa objeto de reconsideración. El resto de la solicitud de la parte demandante en cuanto a que se transcriba la declaración completa, lo entendemos innecesario.

[2] La demandante declaró que el trayecto fue de 45 minutos.

[3] En esta Sentencia Enmendada, se añade esta oración a solicitud de la parte demandante. Sin embargo, ello está contenido en la determinación de hechos número 4, la que se corrige para que, en vez de mano, diga muñeca. Esta corrección se hace a solicitud de la parte demandante. Sin embargo, la misma es inmaterial.

[4] Se corrige esta parte de la Sentencia toda vez que la declaración de la demandante fue que dio de 4 a 5 pasos y no de 3 a 4 pasos, como se dispuso en la Sentencia previa objeto de reconsideración. El resto de la solicitud de la parte demandante en cuanto a que se transcriba la declaración completa, lo entendemos innecesario.

5. Indicó que no había ninguna alfombra al entrar al edificio, ni protección para las sombrillas, ni rótulo, advertencia o aviso[5]. Según su declaración, en la entrada, el piso estaba mojado y en las escaleras también. Indicó que en el tiempo que llevaba allí, nunca daban mantenimiento al área. Admitió que nunca se quejó sobre ese particular. La demandante estuvo trabajando allí por 23 años aproximadamente.

6. De varias fotos contenidas en el Exhibit 1, estipulado, se puede observar algunas paredes deterioradas por humedad. También se observa las ventanas superiores, cerca del techo que están abiertas. Las fotos no fueron tomadas el mismo día de los hechos. No obra en los autos prueba que sostenga la relación causal de este hecho con la caída de la demandante. En la parte que la demandante indicó que resbaló, a preguntas de su abogado y confrontada con el Exhibit 21 (u), cuando se le preguntó qué filtraciones había allí que ella pudiera percibir en las paredes y techo, la demandante indicó: ninguna[6].

7. La demandante describió que la caída fue bien dolorosa, estuvo de dos a tres minutos en el suelo y empezó a gritar porque a esa hora no había nadie en ese piso. Indicó que frente al lugar en el que cayó, se encuentra la oficina del personal de seguridad y llegó alguien de dicha oficina y le ayudó. No vio a nadie de mantenimiento.

8. La demandante testificó que su ropa estaba mojada, que el impacto de la caída fue de tal magnitud que se le subió el "suit" que llevaba puesto. Buscaron una silla y la ayudaron a sentarse. Luego con ayuda, se dirigió al piso 9, donde ubicaba su oficina y prendió la computadora y "...me quedé quieta". Llamó a su jefe y le notificó lo sucedido. Trabajó todo el día.

---

[5] A solicitud de la parte demandante se añade que no había rótulo, advertencia o aviso.

[6] Refiérase a grabación del primer día de juicio, 3:12:08 a 3:12:51. Añadimos esta declaración a los fines de aclarar la determinación de hechos en cuanto a que no existe prueba de relación causal entre las alegadas filtraciones y la caída, toda vez que en el lugar que la demandante se cayó, no había filtraciones conforme su propio testimonio.

9. Al día siguiente[7], miércoles 21 de diciembre de 2016, notificó al señor Santiago, guardia de seguridad. La demandante trabajó continuamente desde el miércoles 21 de diciembre de 2016 al 23 de diciembre de 2016, fecha de receso navideño. La demandante testificó que pasó por la oficina del Dr. Aponte, su médico y le solicitó una orden para una "placa"[8].

10. La demandante testificó que como estaba empeorando, se dirigió al Hospital Auxilio Mutuo donde le realizaron un MRI lumbar que reflejó espacio intervertebral L4-L5, discretamente achicado. Hipertrofia del anillo. Protrusión lateral derecha del disco, anterolistesis L4-L-5 y oesteartropatía apofisaria. Refirió dolor en la espalda y debilidad en las piernas.

11. De ahí, la transfirieron en ambulancia a sala de urgencias del Centro Médico. Fue atendida por el Dr. Pedro Torres López, quien ordenó radiografías y emitió un diagnóstico de trauma lumbar con compresión al cordón. La demandante no pudo ser operada de inmediato por otras situaciones. Luego de varios días en el hospital desde el 5 de enero de 2017, la operaron el 17 de enero de 2017, por el Dr. Fanor Saavedra, neurocirujano quien practicó una cirugía de laminectomía L4-L5, fascetectomía, foraminomía, artrodesis L4-L5 con instrumentación e injerto. El diagnóstico post operatorio fue espondilolistesis grado I/II L4-L5, inestabilidad lumbar, radiculopatía lumbar, estenosis recesos laterales. En su testimonio el perito de la parte demandante, Dr. Grovas Badrena, estableció que el diagnóstico más importante era que el cordón espinal estaba pillado, por lo que requería operación. Véase Informe Pericial, Dr. Grovas Badrena, Exhibit 4, demandante.

12. La demandante estuvo una semana hospitalizada. La demandante, indicó que durante ese periodo sufrió mucho dolor. Luego de la cirugía se sentía mejor, un poco lenta, pero ya no tenía la fuerza como antes. Recibió terapia física

---

[7] Se añade la fecha a solicitud de la parte demandante en la solicitud de reconsideración.

[8] Se elimina la última oración de la Sentencia en la que indica que no fue a recibir tratamiento hasta un mes después de la caída, pues surge que la demandante solicitó a su médico, Dr. Aponte, una "placa". No surge si hubo o no una visita, solo que se le dio una Orden para una "placa".

durante la hospitalización y progresó la ambulación con andador de ruedas. Posterior a ello, fue trasladada a Millenium Institute for Advanced Nursing Care, donde recibió terapia física y ocupacional por una semana. Fue dada de alta el 2 de febrero de 2017, utilizando silla de ruedas y rollator a su residencia, donde recibió servicio de terapia física en el hogar por dos semanas. La demandante regresó a trabajar el 9 de abril de 2017. Indicó que se sentía emocionalmente horrible, que su vida había dado un cambio total. No tenía fuerzas, se sentía insegura. Esta era la primera vez que se había sentido así, pues siempre fue una persona independiente. En la casa tenía ayuda de amistades y de su hijo, pero todo lo hacía más lento y no dormía mucho.

13. Indicó que volver a caminar luego de la cirugía, no fue tan complicado, pero sí doloroso. Estuvo así de 6 a 7 meses, dependiendo de su hijo y amistades para realizar las tareas cotidianas.

14. La demandante no acudió a la Corporación del Fondo del Seguro del Estado, pues prefirió utilizar su plan médico privado.

15. La demandante recibió un total de 14 terapias. 7 terapias en Millenium y 7 en su hogar[9].

16. La demandante es diabética dependiente de insulina. Tiene artritis y padece de alta presión y sobrepeso. Indicó que sufrió un ataque masivo al corazón 8 meses previo a la fecha del juicio.

17. Confrontada en el contrainterrogatorio con el Exhibit 1, (23-X), estipulado, en el cual se identifica una alfombra en la entrada del edificio, la demandante indicó que no recuerda nada de esa alfombra. Admitió que se cayó porque "resbalé". Admitió que en el lugar donde se cayó no había filtraciones en las paredes ni en el techo[10] y que, aunque no

---

[9] Se enmienda para indicar donde fueron las terapias.

[10] Se modifica para aclarar que no había filtraciones en las paredes ni en el techo, según solicitado por la demandante. Apuntamos que precisamente esta declaración fundamenta nuestra determinación de que no existe relación causal entre las alegadas filtraciones y la caída. Este Tribunal se reitera en que la demandante no vio nunca con qué sustancia resbaló y que supuso que había sido con agua porque su espalda estaba mojada. Sin embargo, recordemos que la demandante se estacionó en un área a la intemperie y estaba lloviendo profusamente.

vio que el piso estaba mojado, **asumió que lo estaba porque resbaló y su ropa estaba mojada**.

18. La demandante no vio un charco, ni agua en el lugar que resbaló.

19. El doctor Carlos Grovas Badrena es el perito de la parte demandante y quedó debidamente cualificado conforme su *curriculum vitae* y su experiencia como Evaluador Médico Independiente. Especificó que el evaluador establece lo que orgánicamente tiene la persona al momento de su evaluación de impedimento y que no reconstruye el accidente. Utilizó la Guía VI en donde establece el diagnóstico y la funcionalidad de la persona.

20. El Dr. Grovas Badrena rindió un informe sobre la demandante el 12 de marzo de 2018. Exhibit 4, parte demandante. En este establece el historial de la demandante y lo que ésta le refirió respecto a la caída que sufrió el 16 de diciembre de 2016. La evaluación se llevó a cabo el 12 de marzo de 2018. A esa fecha, la demandante tenía estatura de 5'3 y un peso de 200 libras, surge del informe que estaba alerta, orientada y cooperadora. No ambula sobre talones y dedos del pie y no se acuclilla. Sobre el aspecto lumbar, surge que tiene estiramiento de la lordosis fisiológica lumbar, espasmo en las masas paralumbares y muestra una herida quirúrgica cicatrizada vertical de 4" a nivel de la L3 a S1, no adherente, no dolorosa.

21. El Dr. Grovas Badrena diagnosticó, protusión del disco L4-L5 con radiculopatía, status post fusión espinal L4-L5 con instrumentación e injerto, esguince y contusión lumbares. No relacionado: espondilolistesis, enfermedad degenerativa disco lumbar, osteoartropatía apofisaria e hipertrofia ligamentum flavum.

22. Utilizando las Guías para Evaluación de Impedimento Permanente, Sexta Edición, Asociación Médica Americana, noviembre 2007, revisada abril 2009, el doctor Grovas Badrena estableció un 9% de impedimento parcial permanente de las funciones fisiológicas generales del área columna lumbar de la demandante.

23. Sobre el informe pericial del Dr. Cortés, perito de la parte demandada, Grovas Badrena expuso que es un excelente

fisiatra y evaluador médico y que las diferencias son sutiles, toda vez que el Dr. Cortés determinó un 7% de impedimento y, conforme a las Guías, una diferencia de 3 o menos en los porcientos dados por diferentes evaluadores, es aceptable. Aceptó que el diagnóstico de la demandante puede estar también afectado por su sobrepeso, así como por condiciones degenerativas. Admitió que un 8% de impedimento general es razonable.

24. Grovas Badrena indicó que no consideró condiciones prexistentes de la espalda baja, pues la demandante no las refirió y/o no surgían de los expedientes médicos. Sin embargo, de existir, podría considerarlas.

25. El doctor Héctor M. Cortés Santos es el perito de la parte demandada y quedó debidamente cualificado conforme su *curriculum vitae* y su experiencia como Evaluador Médico Independiente. El Dr. Cortés Santos evaluó a la demandante el 29 de mayo de 2018 y rindió un informe pericial el 30 de junio de 2018, el cual obra en autos. Exhibit 2, parte demandada.

26. El Dr. Cortés, al igual que el Dr. Grovas Badrena, evaluó físicamente a la demandante y examinó todos sus expedientes médicos. La demandante le refirió que continuaba con dolor en espalda baja. Cortés testificó que, al momento de la evaluación, ésta llegó alerta, no tenía faja en la espalda, caminaba bien, aunque lento y utilizaba un bastón de 4 patas. La demandante pudo ponerse en "puntitas". Observó espasmos en la espalda y cambios vasculares en las extremidades bajas consistentes con cambios neuropáticos. Sus reflejos estaban normales, aunque noto cierta debilidad en las extremidades inferiores. Su tono muscular era normal y sensación disminuida a mitad de la pantorrilla hacia abajo.

27. Expuso que en el informe del Dr. Grovas Badrena no surge que parte de las condiciones de la demandante se deban a cambios degenerativos, previos a la caída de la demandante. Sin embargo, surge de los récords del centro de rehabilitación de Millenium y del Hospital en sala de emergencia que ésta manifestaba un "dolor de espalda crónico", lo que es consistente con cambios degenerativos.

Definió dolor crónico como aquél que se mantiene por 6 meses o más.

28. Luego de la evaluación, Cortés determinó que la demandante tiene un 7% de impedimento general y que la cirugía corrigió su situación. Grovas Badrena en su testimonio indicó:

> Evalué el expediente del Dr. Cortés, quien conozco hace varios años, es un excelente fisiatra y no solamente un excelente fisiatra sino un excelente evaluador médico y hemos compartido en varias ocasiones previas. Su informe como todos los informes de él es un informe excelente, y yo tengo ciertas diferencias sutiles.
>
> Noté que el Dr. le brinda un 7% y yo le brindo un 9%.
>
> Las guías dicen que si la diferencia entre uno y otro es menos de 3% los dos informes son viables, son reconocidos y pueden someterse. Estipulan las guías que si la diferencia es 3 o menos los informes ambos son aceptables. Si él hubiese otorgado un 9 y el un 3, pues entonces habría una discrepancia mayor, pero la discrepancia es una aceptable por las guías.

29. En virtud del testimonio del Dr. Grovas, se determina que un 7% de impedimento es razonable[11].

Con esos hechos que consideró probados, el TPI emite su Sentencia.

Inconforme con la Sentencia, el 31 de julio de 2023, la demandante, aquí apelante, presenta esta apelación. En respuesta, las recurridas presentaron una Moción de desestimación de Recurso de Apelación por Falta de Jurisdicción. La parte Apelante replicó conforme ordenado y el 30 de agosto de 2023, este Tribunal emitió una Sentencia Desestimando el recurso. La parte Apelante presentó Moción en Solicitud de Reconsideración, la que le fue denegada y oportunamente recurre ante el Tribunal Supremo de Puerto Rico mediante recurso de

---

[11] Se modifica la determinación de hechos número 28 para añadir un extracto del testimonio del Dr. Grovas. Se añade la determinación de hechos número 29 a los fines de determinar que el 7% es un número razonable, a la luz del testimonio del Dr. Grovas.

Certiorari, al que se le dio el número CC.2023-0688. El Tribunal Supremo, por mayoría de sus miembros, expidió el Recurso de Certiorari y revocan a este Tribunal mediante Sentencia del 19 de abril de 2024. Recibido dicho mandato, acatamos el mismo y ordenamos continuar el trámite.

En el recurso se plantearon por la parte apelante los siguientes errores que transcribimos a continuación.

## SEÑALAMIENTO DE ERRORES

**PRIMERO**: ERRÓ EL TPI AL DESESTIMAR LA DEMANDA POR ALEGADAMENTE NO HABERSE PROBADO LA NEGLIGENCIA O LA OMISIÓN DE LOS DEMANDADOS.

**SEGUNDO**: ERRÓ EL TPI AL DESETIMAR LA DEMANDA A PESAR DEL TESTIMONIO CREÍBLE DE LA DEMANDANTE, EL CUAL NO FUE DESCARTADO POR EL TPI, Y QUE NO FUE REFUTADO NI POR UN SOLO TESTIGO DE LA PARTE DEMANDADA.

**TERCERO**: ERRÓ EL TPI AL DESCARTAR LA DECLARACIÓN DE LA DEMANDANTE QUE SURGE EN EL INFORME PERICIAL DE LOS DEMANDADOS EN TORNO A QUE PERCIBIÓ LA PRESENCIA DE AGUA EN EL PASILLO Y QUE CRUZÓ ESA ÁREA PUES LA GERENCIA DEL CONDOMINIO NUNCA ATENDÍA ESOS ASUNTOS NI EVITABA ESOS PROBLEMAS.

**CUARTO**: ERRÓ EL TPI AL NCLUIR EN SUS DETERMINACIONES UNOS HECHOS INCONSISTENTES CON LA PRUEBA DESFILADA EN EL JUICIO.

**QUINTO**: ERRÓ EL TPI AL EXCLUIR EN SUS DETERMINACIONES UNOS HECHOS QUE FUERON PROBADOS DURANTE EL JUICIO Y NEGÁNDOSE ASÍ A INCLUIRLOS EN LA SENTENCIA PESE A QUE FUERON PROBADOS POR LA APELANTE.

**SEXTO**: ERRÓ EL TPI AL DESESTIMAR LA DEMANDA Y, POR ENDE, DENEGAR LA CONCESIÓN DE LOS DAÑOS QUE SE RECLAMARON Y SE PROBARON EN EL JUICIO.

**SÉPTIMO**: ERRÓ EL TPI AL NEGAR LA EXISTENCIA DE NEGLIGENCIA Y OMISIÓN POR LOS DEMANDADOS PESE A QUE PUDIERON

HABER TOMADOS LAS MEDIDAS CORRECTIVAS NECESARIAS CON TIEMPO PARA EVITAR LA CAÍDA DE LA DEMANDANTE.

**OCTAVO**: ERRÓ EL TPI AL DESESTIMAR LA DEMANDA PESE A SU PROPIA DETERMINACIÓN DE HECHO DE QUE NO HABÍA NINGUNA ALFOMBRA AL ENTRAR AL EDIFICIO, NI PROTECCIÓN PARA LAS SOMBRILLAS, NI RÓTULO, NI ADVERTENCIA NI AVISO DE SUELO MOJADO.

**NOVENO**: ERRÓ EL TPI AL DESESTIMAR LA DEMANDA POR ALEGADAMENTE NO EXISTIR PRUEBA QUE SOSTUVIESE LA RELACIÓN CAUSAL DE LOS HECHOS PROBADOS DE LA NEGLIGENCIA Y OMISIONES DE LOS DEMANDADOS CON LA CAÍDA DE LA DEMANDANTE.

**DÉCIMO**: ERRÓ EL TPI AL CONCLUIR QUE POR NO HABER FILTRACIONES EN EL TECHO Y PISO DEL PASILLO DONDE SE CAYÓ LA DEMANDANTE, LAS OTRAS UBICADAS EN LAS ESCALERAS NO CONTRIBUYERON A QUE OTRAS PERSONAS TRANSPORTARAN ESA AGUA Y HUMEDAD AL PASILLO DONDE OCURRIÓ LA CAÍDA.

**UNDÉCIMO**: ERRÓ EL TPI AL NO PERMITIR COMO EVIDENCIA EN SALA EL INFORME SOBRE EL INCIDENTE QUE LOS DEMANDADOS NOTIFICARON A LA DEMANDANTE TAN SOLO UNOS DÍAS ANTES DEL DEL JUICIO (Y AÑOS LUEGO DE CULMINADO EL DESCUBRIMIENTO DE PRUEBA) Y PERMITIR QUE PESE A ESA ADMISIÓN DE PARTE SOBRE LA OCURRENCIA DEL HECHO Y LA ADMISIÓN DE UN ELEMENTO DE RIESGO RECURRENTE, DICHO DOCUMENTO NO FUESE ADMITIDO PARA PROBAR EL CONOCIMIENTO PREVIO Y SU OMISIÓN EN EVITAR QUE ELLO PROVOCARA LA CAÍDA DE PERSONAS COMO LO OCURRIDO CON LA DEMANDANTE.

**DUODÉCIMO**: ERRÓ EL TPI AL NO TRANSFERIR EL PESO DE LA PRUEBA A LA PARTE DEMANDADA PARA REFUTAR SU TESTIMONIO LUEGO DE QUE LA DEMANDANTE PROBÓ Y ESTABLECIÓ MEDIANTE LA PREPONDERANCIA DE LA PRUEBA QUE EL NEXO CAUSAL DE SUS DAÑOS FUE LA OMISIÓN Y NEGLIGENCIA DE LOS DEMANDADOS AL NO PROCURAR UN LUGAR SEGURO PARA LAS PERSONAS QUE HACÍAN USO DE SUS FACILIDADES COMUNES EN EL EDIFICIO CUANDO LLOVÍA NI REFUTARLO CON EL TESTIMONIO DE PERSONAL DE MANTENIMIENTO QUE ALEGARA

QUE LOS PASILLOS SE MANTENÍAN SECOS EN CASOS DE EVENTOS DE LLUVIAS.

Durante el trámite para evaluar el recurso en sus méritos, se aceptó, por resolución del 1 de julio de 2024, que se presentara una transcripción estipulada por las partes, la que se recibió el 29 de julio de 2024. Luego el 19 de agosto de 2024 la parte Apelante presentó como alegato suplementario un escrito que tituló Recurso de Apelación y el 9 de septiembre de 2024, la parte recurrida presentó Alegato en Oposición a Apelación y el recurso quedó perfeccionado para ser resuelto, lo que aquí hacemos.

Veamos el derecho aplicable a esta controversia.

## II.

## A.

El Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141[12], dispone que quien, por acción u omisión, cause daño a otro mediando culpa o negligencia, estará obligado a repararlo. La obligación surgirá si el demandante logra establecer, mediante la preponderancia de la prueba, tres elementos: el acto u omisión culposa o negligente; el daño causado y la relación causal entre ambos. *Nieves Díaz v. González Massas*, 178 D.P.R. 820, 843 (2010).

La culpa o negligencia estriba en la ausencia del debido cuidado, "en no anticipar y prever las consecuencias racionales de un acto o de su omisión, las cuales una persona prudente y razonable habría previsto en las mismas circunstancias". *López v. Porrata Doria*, 169 D.P.R. 135, 151 (2006). En nuestro ordenamiento, el concepto de culpa es "tan amplio y abarcador

---

[12] El referido Código Civil de Puerto Rico de 1930, según enmendado, 31 LPRA ant. sec. 1 *et seq.,* fue derogado por el Código Civil de Puerto Rico de 2020, aprobado mediante la Ley Núm. 55 de 1 de junio de 2020, según enmendada, 31 LPRA sec. 5311 *et seq*. No obstante, para fines del presente caso, se hace referencia únicamente al Código Civil derogado por ser la ley vigente y aplicable a la controversia ante nuestra consideración.

como suele ser la conducta humana e incluye cualquier falta de una persona que produce un mal o daño". *Nieves Díaz v. González Massas*, *supra,* pág. 843-844; *Íd.* Obra de manera culposa quien no despliega la diligencia de una persona común y ordinaria, de un buen padre de familia. *López v. Porrata Doria*, *supra*; *Gierbolini v. Employers Fire Ins. Co.*, 104 D.P.R. 853, 860 (1976). En cambio, para que se configure una causa de acción por una alegada omisión será necesario establecer que existía una obligación de actuar, que fue quebrantada y que de haberse realizado el acto omitido se hubiese prevenido el daño. *Santiago v. Sup. Grande*, 166 D.P.R. 796, 807 (2006). Según lo ha expresado nuestro Tribunal Supremo "la *pregunta de umbral* en estos casos es si existía un deber jurídico de actuar de parte del alegado causante del daño". (Citas omitidas.) (Énfasis en el original.) *Íd.*

La relación causal que debe existir entre la acción u omisión culposa o negligente y el daño se rige en nuestro ordenamiento por la doctrina de la causalidad adecuada, que propone que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". (Citas omitidas.) *Colón Ramírez v. Televicentro de P.R.*, 175 D.P.R. 690, 707 (2009). Ello implica que la ocurrencia del daño "era previsible dentro del curso normal de los acontecimientos". *López v. Porrata Doria*, *supra,* pág. 152. El deber de anticipar y prever los daños no se extiende a todo peligro imaginable, sino a aquél que llevaría a una persona prudente a anticiparlo. *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294, 309 (1990). Si de una evaluación retrospectiva, un daño emerge como la consecuencia razonable y ordinaria de un acto negligente, se

considerará que el daño es un resultado probable de dicho acto. *Valle v. E.L.A.*, 157 D.P.R. 1, 19 (2002).

A los fines de considerar la causa legal o causalidad productora de responsabilidad jurídica, en nuestro ordenamiento rige la teoría de la causalidad adecuada. Conforme a ella "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". (Citas Omitidas). *Sociedad de Gananciales v. Jerónimo Corp.*, 103 D.P.R. 127, 134 (1974); *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700 (1982); *Cárdenas Maxán v. Rodríguez Rodríguez*, 125 D.P.R. 702, 710 (1990). Esta normativa ha sido fundamentalmente desarrollada con el propósito de limitar la responsabilidad civil a aquellos casos en que la ocurrencia de un hecho dañoso sea imputable moralmente a su alegado autor, por que éste era una consecuencia previsible o voluntaria del acto negligente. *Soto Cabral v. E.L.A.*, 138 D.P.R. 298, 317 (1995). Así pues "un daño parece ser el resultado natural y probable de un acto negligente si después del suceso, y mirándolo retroactivamente el acto que se alega ser negligente, tal daño aparece como la consecuencia razonable y ordinaria del acto". *Torres Trumbull v. Pesquera,* 97 D.P.R. 338, 343-344 (1969).

Siguiendo esta tónica en caso de concurrencia de causas, hemos resuelto que la cuestión a dilucidar es cuál de las causas fue la eficiente. Es decir, hay que estimar como decisiva la que por sus circunstancias determina el daño. Mas aún, en un caso de concurrencia de culpas, cuando es evidente la desproporción entre culpas causantes de un daño, la mayor absorbe totalmente la otra y excluye la aplicación de la norma de negligencia comparada. *Cárdenas Maxán v. Rodríguez Rodríguez*, 125 D.P.R.

702, 710 (1990).  Véase, además, *Toro Lugo v. Ortiz Martínez*, 113 D.P.R. 56 (1982).

**B.**

En atención a los elementos necesarios para establecer la responsabilidad en daños y perjuicios de los establecimientos comerciales conforme al Art. 1802, supra, debemos reseñar que las empresas que operan establecimientos abiertos al público con fines comerciales tienen la obligación de mantenerlos en condiciones óptimas de seguridad, de manera que sus clientes no sufran daño alguno. *Colón y otros v. Kmart y otros*, 154 DPR 510, 518 (2001).[13]

De lo anterior se deriva, que dicho deber implica que el dueño u operador del establecimiento ejercerá un cuidado razonable **para mantener la seguridad de las áreas accesibles al público**. No obstante, se ha interpretado que el dueño del establecimiento **no asume una responsabilidad absoluta por todos los daños que pueden sufrir sus clientes, pues no es un asegurador de estos**. *Íd*. En consecuencia, *[p]ara que se le imponga responsabilidad, el demandante tiene que probar que el dueño no ejerció el debido cuidado para que el local fuese seguro. En los casos de accidentes en establecimientos comerciales, este Tribunal ha impuesto responsabilidad siempre que el demandante pruebe que existían condiciones peligrosas dentro de las tiendas correspondientes, "las cuales eran de conocimiento de los propietarios o su conocimiento podía imputárseles a estos". (cita omitida). En otras palabras, el demandante tiene que probar que su daño se debió a*

---

[13] Citando a: *Cotto v. C.M. Ins. Co.*, 116 DPR 644 (1985); *Aponte Betancourt v. Meléndez,* 87 DPR 652 (1963); *Weber v. Mejías*, 85 DPR 76, 79-80 (1962); *Santaella Negrón v. Licari,* 83 DPR 887 (1961); *Goose v. Hilton Hotels*, 79 DPR 523 (1956); *Gutiérrez v. Bahr*, 78 DPR 473 (1955).

*la existencia de una condición peligrosa, y que esa condición fue la que con mayor probabilidad ocasionó el daño, y que la misma era conocida por el demandado, o que debió conocerla. (cita omitida). Íd.*, a las págs. 518-519.

Acorde con lo anterior, el demandante tiene que probar que: (1) su daño **se debió a la existencia de una condición peligrosa**, (2) que esa condición fue la que con mayor probabilidad ocasionó el daño, (3) que la misma era conocida por el demandado, o que debió conocerla, y si (4) ante la existencia de la condición peligrosa y su conocimiento, transcurrió un término razonable suficiente para corregir la situación sin que se hubiera reparado. Si la parte demandante no establece con prueba estas condiciones, no procede la imposición de responsabilidad.

**C.**

El Tribunal Supremo de Puerto Rico, ha establecido que no debemos ser dados a intervenir con las determinaciones de hechos que hace un tribunal de instancia y a sustituir nuestro criterio, por el del juzgador ante quien declararon los testigos y quién tuvo la oportunidad de verlos declarar y apreciar su *demeanor*. *Ramos Acosta v. Caparra Dairy Inc*, 113 D.P.R. 357, 365 (1982).

> … y es que no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer, incluso, más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad; la observación…" Ortiz v. Cruz Pabón, 103 D.P.R. 939, 947 (1975).

De ahí la norma trillada de "no intervenir con la apreciación que de la prueba desfilada haya hecho el foro de instancia en ausencia de pasión, perjuicio, parcialidad o error manifiesto". *Monllor Arzola v. Sociedad de Gananciales*, 138 D.P.R. 600, 610 (1995); *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 181 (1985); *Pérez Cruz v. Hospital la Concepción*, 115 D.P.R. 721 (1984). No obstante, "[e]l arbitrio del juzgador de hechos es respetable, mas no es absoluto. Una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal". (Citas Omitidas.) *Ramos Acosta v. Caparra Dairy, Inc.*, *supra*.

Así pues, los foros apelativos pueden dejar sin efecto las determinaciones de hechos realizadas por el foro de instancia, siempre que "del examen de la totalidad de la evidencia el Tribunal de revisión queda definitiva y firmemente convencido que un error ha sido cometido, como es el caso en que las conclusiones de hecho están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". Véase, *Maryland Casualty Co. v. Quick Const. Corp.*, 90 D.P.R. 329, 336 (1964). Además, es principio cardinal de derecho que este Tribunal, en el ejercicio de su facultad revisora, tiene amplia discreción en la apreciación de la prueba pericial y documental ofrecida, encontrándose en la misma posición que los tribunales de instancia y pudiendo aún adoptar su propio criterio en la apreciación de ella. *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 721 (1983); *Velázquez v. Ponce Asphalt*, 113 D.P.R. 39 (1982); *Zambrana v. Hospital Santo Asilo de Damas,* 109 D.P.R. 517, 522 (1980). No obstante, … nuestra decisión debe estar fundada en la prueba vertida en el juicio, por los testigos, incluidos

los peritos y la prueba documental.  En ausencia de prueba no es nuestra función establecer a este nivel apelativo los elementos requeridos por el Art. 1802 del Código Civil. *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 821-822 (1987).

**D.**

La Regla 110 de las Reglas de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 110, dispone que:

> La juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los siguientes principios siguientes:
> (a) El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes.
> (b) La obligación de presentar evidencia primeramente recae **sobre la parte que sostiene la afirmativa en el asunto en controversia**.
> […] [Énfasis nuestro]

Del citado inciso (b) surge la obligación que tiene un litigante, que asevera un hecho como parte de la teoría de su caso, de probarlo cumplidamente. Así pues, no le corresponde a la parte demandada traer prueba para desmentir la alegación formulada por la demandante. *Asoc. Auténtica Empl. v. Municipio de Bayamón*, 111 DPR 527, 531 (1981). La obligación de presentar evidencia primeramente recae **sobre la parte que sostiene la afirmativa**. Además, es norma trillada que meras alegaciones o teorías no constituyen prueba. *Íd.* Por tanto, en lo aquí pertinente, destacamos que la negligencia nunca se puede presumir, pues para concluir que el acto fue negligente **se requiere prueba clara y específica**. *Colón y otros v. K-mart y otros*, 154 DPR 510, 521 (2001).

**E.**

Las Reglas 37.4 y 37.5 de las de Procedimiento Civil, 32 L.P.R.A. Ap. V, R.37.4 y 37.5, disponen, entre otros, que las

partes revelen en el Informe Preliminar que se tiene que preparar y presentar, antes de la Conferencia con Antelación a Juicio, los documentos y exhibits que interesan presentar como prueba en el Juicio.  El incumplimiento con esta obligación puede conllevar la exclusión de la prueba sometida sorpresivamente en el juicio, que no fue incluida en el Informe de Conferencia.  A los fines de determinar si se excluye o no la prueba no anunciada, el tribunal deberá considerar las justificaciones, si algunas, para el incumplimiento, la importancia de la prueba, la necesidad de tiempo para la parte afectada prepararse para contrarrestar dicha prueba, la posibilidad de suspensión y el perjuicio que causaría la admisión de la prueba. Cuevas Segarra, J.A., *Práctica Procesal Puertorriqueña, Procedimiento Civil*, San Juan, Puerto Rico, Pubs. J.T.S., 1985, Vol. II, Cap. V.

Además, para determinar si la evidencia admitida o excluida fue un factor decisivo o sustancial en la sentencia emitida, hay que llevar a cabo "un cálculo algo especulativo, en términos de cuál es la probabilidad de que, de no haberse cometido el error, el resultado hubiera sido distinto". De no ser así, se entenderá que fue un error benigno (*harmless error*) y no conllevará la revocación de la determinación. *Izagas Santos v. Family Drug Center,* 182 DPR 463, 483-484 (2011).

### III.

Expuesto el marco jurídico y examinados los documentos que obran en el expediente apelativo, pasamos a resolver la controversia ante nuestra consideración.

En específico, para prevalecer en una acción de daños de esta naturaleza, es necesario que la Apelante probara: (**1**) la existencia de un daño real; (**2**) el nexo causal entre el daño y la

acción u omisión de los demandados, aquí apelados y (**3**) el acto u omisión culposo o negligente de éstos. Ver explicación en el derecho aplicable antes detallado.

La parte apelante nos solicita la revocación de la *Sentencia Enmendada,* cuya apelación aquí atendemos y en la cual se desestimó la demanda incoada en contra los apelados. La Sentencia Enmendada es el producto de la evaluación de la prueba desfilada y luego del TPI dirimir credibilidad y valor probatorio de la prueba presentada durante el juicio y mociones posteriores a una Sentencia inicial. El TPI concluye que no se probó conforme a derecho nexo causal entre la caída y los daños por los que se reclama. Veamos.

Por considerar que los errores reclamados con los números del primero al décimo están relacionados entre sí, con la evaluación y credibilidad que otorgó el TPI a la prueba que se admitió durante el Juicio, los discutiremos de forma conjunta.

En el presente caso la apelante alega haber sufrido una caída el 20 de diciembre de 2016 en el condominio The Executive, donde ubicaba la compañía para la cual trabajaba en ese momento. La apelante estuvo trabajando en dicho lugar por muchos años.[14] Veamos la prueba testifical que le permite al TPI concluir como lo hizo:

P. ¿Desde cuándo usted trabajaba con ellos?
R. Desde el mil novecientos noventa y cuatro (1994). Enero dos (2), mil novecientos noventa y cuatro (1994).
P. ¿Dónde ubica esa oficina?
R. En The Executive Building.[15]

POR LA LCDA. KILMARIS MALDONADO PÉREZ:
P. Mire, doña Carmen. Lo cierto es que usted llevaba más de veinte (20) años trabajando en el edificio The Executive, ¿correcto?

---

[14] Apéndice de la parte apelante, página 271.) Parte de Sentencia Enmendada).
[15] Transcripción de la prueba Oral Estipulada página 164, líneas 3-8.

TESTIGO - SRA. CARMEN TORRES RIVERA:

R. Eso es correcto.

P. Sí, mire. Eh... Y lo cierto es que usted llevaba, aproximadamente, doce (12) años o más estacionándose en el... en„. en el segundo piso del edificio, ¿correcto, de esos veinticinco de años?

R. Sí.

P. Correcto. Mire, lo cierto también es que, según usted relató, usted se desempeñaba como gerente de la oficina...

R. Correcto.

P. ...de donde usted trabajaba. Olivetti, ¿correcto?

R. Olivieri.

P. Olivieri, perdón. Olivieri. Usted, como gerente, era la que administraba la oficina, preparaba los cheques. Usted estaba a cargo de toda la labor administrativa. [16]

La apelante testificó que en el edificio no había alfombras en la entrada, no había protección para sombrillas, las ventanas superiores de las escaleras internas estaban abiertas y que existían filtraciones en las paredes que provocaban humedad. La demandante admitió que nunca notificó o se quejó sobre dichas situaciones.[17]

P. ¿Qué hacían eh... los administradores del edificio o las personas a cargo en mantenimiento para evitar eso?

R. Nada..

P. ¿Cuándo usted se quejó de eso?

R. ¿Perdón?

P. ¿Cuándo usted se quejó de eso?

R. Le digo la verdad, que no me molesté porque no... ese edificio, cuando venía mantenimiento cero (0).[18]

Conforme la declaración en juicio de la apelante, el día de los hechos amaneció lloviendo y estuvo lloviendo durante toda la noche. De hecho, el día de los hechos la demandante narró que, durante todo el trayecto desde su residencia a su lugar de trabajo, continuó lloviendo.[19]

P. ¿Cómo estaban las condiciones del tiempo ese día eh... del veinte (20) de diciembre, dos mil dieciséis (2016)?

---

[16] Transcripción de la prueba Oral Estipulada, página 220, líneas 15-24 y página 221, líneas 1-11.

[17] Apéndice de la parte apelada, Sentencia Enmendada, página 271.

[18] Transcripción de la prueba Oral Estipulada, página 180, líneas 10-19.

[19] Apéndice de la parte apelante, página 271, parte de Sentencia Enmendada.

TESTIGO - SRA. CARMEN TORRES RIVERA:
R. Lluvioso.
P. ¿Desde cuándo estaba lloviendo?
R. En la noche anterior.
P. ¿En dónde, en su casa?
R. Sí, en mi casa y en camino 'pal' trabajo.  Lloviendo y lloviendo y lloviendo.[20]

El lugar en el cual la demandante estacionaba su auto estaba a la intemperie. Por tanto, la demandante se bajó de su auto y tomó la cartera, una bolsa y el paraguas en su otra mano. Procedió a abrir con la llave la puerta de acceso al edificio y subió las escaleras.[21]

P. ¿Qué pasó luego de que usted se estaciona?
R. Luego que yo me estaciono, me bajo, camino hacia esa cuesta que usted vio aquí. Esta cuesta es con llave.[22]
P. ¿Cómo abre esa puerta? ¿Cómo... cómo es que se abre esa puerta?
R. Con llave.
P. ¡Ah! Con llave.
R. Sí. Con llave la abro. Cierro la sombrilla. Porque todo el tiempo, como está lloviendo, pues tengo... me estoy todavía cuidando hasta que abro la puerta. Una vez que abro la puerta, pues sacudo la sombrilla afuera. Entro aquí, al primer nivel. Subo esos dos (2) o tres (3) escalones que hay otra puerta.[23]

Una vez en el segundo nivel, ya en el pasillo, la apelante narró que dio cuatro o cinco pasos y cayó.[24]

P. Eh... ¿Qué pasa entonces a usted... al usted llegar a esa segunda puerta?

TESTIGO - SRA. CARMEN TORRES RIVERA:
R. Okey. Entro, y entonces paso esta ofici... esta oficina que está aquí y la otra que está al frente. Doy como cuatro (4) o cinco (5) pasos, algo así, y me voy al aire. Resbalé. Pero resbalé de una altura.[25]

Es decir, desde que entró hasta que se cayó, la apelante pasó un trayecto de subir un set de escaleras, llegar al segundo nivel, abrir otra puerta y entrar al pasillo. De haber existido una alfombra en la entrada, ello no hubiese evitado la caída pues la

---

[20] Transcripción de la prueba Oral Estipulada, página 174, líneas 7-16.
[21] Apéndice de la parte apelante, página 272, parte de la Sentencia Enmendada.
[22]Transcripción de la prueba Oral Estipulada, página 174, línea 24 y pagina 175, líneas 1-2.
[23] Transcripción de la prueba Oral Estipulada, página 178, líneas 4-13.
[24] Apéndice de la parte apelante, página 272, parte de Sentencia Enmendada.
[25] Transcripción de la prueba Oral Estipulada, página 188, líneas 2-9.

distancia desde la entrada al lugar en que cayó la apelante (según su propio testimonio) es considerable.[26]

TESTIGO - SRA. CARMEN TORRES RIVERA:
R. Correcto.
P. Y usted dijo que esa puerta es con llave, ¿correcto?
R. Esta... esta puerta de ahí sí, es con llave.
P. Con llave. O sea, que ese estacionamiento era, exclusivamente, para los empleados, ¿correcto?
R. Unjú.
P. Empleados, más bien...
R. Bueno…
P. Corrijo la... corrijo la premisa. Discúlpeme. Para aquellos [sic] personas que trabajaban o tenían ofi... eh... oficinas en el edificio, ¿correcto?
R. Eso es correcto.
P. Bien. Mire y le pregunto eh... si usted tenía que subir las escaleras para llegar al pasillo para el ascensor o bajar. Si usted se fija; para ponerlo en contexto, verdad, porque el proceso está grabado; la fotografía lo que refleja es unas escaleras que van hacia arriba y unas escaleras con un pasamanos que van hacia abajo, ¿correcto? Eso es lo que dice la fotografía.
HONORABLE JUEZA:
Tiene que expresarlo con la voz.

POR LA LCDA. KILMARIS MALDONADO PÉREZ:
P. ¿Sí?

TESTIGO-SRA. CARMEN TORRES RIVERA:
R. Perdone. Sí.
P. Sí. Y entonces lo que... mi pregunta era entonces, con respecto a esa fotografía, es que usted, de acuerdo a esa fotografía, usted iba a subir las escaleras.
R. Eso es correcto.
P. Okey. Usted relató, a preguntas del compañero, que una vez que usted sube el escalón del estacionamiento, entra, abre la puerta con llave, entra al edificio, sube las escaleras, abre otra puerta, entra al pasillo, usted da de cuatro (4) a cinco (5) pasos, se cae.
R. Correcto.
P. Okey. Mire, doña eh... Carmen. Lo cierto es que usted no sabe por qué usted se cayó, ¿correcto?
R. Bueno.
P. ¿Sí o no?
R. Sí, sé.
P. ¿Sí, sabe?
R. Me caí porque me resbalé. No... no...
P. Por eso. Usted dice que se resbaló.
R. Claro.
P. Okey. Bien. Pero mire, lo cierto es que en ese pasillo en el que usted alega que se resbaló, no habían filtraciones. ¿Sí o no?
R. No.
P. No.
R. No había filtraciones.

---

[26] Apéndice de la parte apelante, página 272, parte de Sentencia Enmendada.

P. Bien.[27]

POR LA LCDA. KILMARIS MALDONADO PÉREZ:
P. Doña Carmen, nuevamente. Esta deposición se tomó dos (2) años después de su alegada caída. Le pregunto, en ese momento que se le hizo... habiendo usted leído esta deposición, ¿usted no vio que el piso estaba mojado?

TESTIGO - SRA. CARMEN TORRES RIVERA:
R. Este... No.
P. No. Okey. Por ende, le pregunto, doña Carmen, si usted puede decir si el piso estaba mojado, si no lo vio. ¿Sí o no?
R. Pero la ropa...
P. ¿Sí o no, doña Carmen?
R. ¿Sí o no? No.
P. No. Okey. Mire, doña Carmen. El pasillo por el cual usted transitando y alega haber sufrido una caída, tenía buena iluminación, ¿correcto?
R. Sí.
P. Sí. Mire, lo cierto es que usted, a pesar de que es gerente de esa oficina por veintipico de años, verdad, usted no hizo un reporte escrito de su caída. Con la voz. Con la voz. No lo hizo, ¿no?
R. No, no lo hice.
P. No. Ni tampoco su jefe, al que usted alega haber llamado ese mismo día, hizo un reporte de su caída, ¿correcto?
R. Correcto.
P. No existe un informe de incidente de su caída. No. Con la voz.
R. No.
P. No. Mire, y lo cierto también es que el día de esa alegada caída, que usted dice que ocurre el veinte (20) de diciembre del dos mil dieciséis (2016), usted no fue a ningún médico ni a ningún hospital, ¿correcto?
R. Correcto.
P. De hecho, usted ese día continuó trabajando, ¿correcto?
R. Si.
P. Y al otro día también trabajó.
R. También.
P. Okey. Y no...
R. Hasta el día veintitrés (23).
P. Correcto. Y... y hasta el día veintitrés (23), porque había un receso de Navidad, ¿correcto?
R. Eso es correcto. (Transcripción de la prueba Oral Estipulada, página 235, página 236, líneas 1-22)

A base del testimonio de la propia, apelante evaluado por el TPI, se determinó que, en el juicio, la apelante admitió que no vio agua en el piso, ni sustancia alguna y que además declaró que ella supuso que resbaló con agua que había en el pasillo, porque estaba lloviendo afuera y cuando se tocó su ropa por detrás estaba

---

[27] Transcripción de la prueba Oral Estipulada, página 221 líneas 22-24, página 222, 223, y 224, líneas 1-6.

mojada. De las alegaciones de la apelante surge que en dicho edificio existen problemas de filtración en las paredes y techo, razón por la cual sufrió una caída. En relación con esta alegación, la parte apelante no presentó prueba alguna que tienda a establecer ese hecho, no se estableció que la alegada agua en el piso del pasillo se debiera a dicha situación ni que ese hecho fuera la causa de la caída. Es por todo lo anterior que el TPI habiendo analizado la totalidad la prueba recibida, concluyó que la parte apelante no descargó su obligación de presentar prueba suficiente que tienda a establecer un acto negligente de los apelados por omisión.

Como reseñamos, la doctrina de la causalidad adecuada dispone que no es causa toda condición sin la cual no se hubiera producido el daño, sino **la que ordinariamente lo produce** según la experiencia general. Así que, para surgir el elemento del nexo causal, **debe de existir una relación entre el daño y la consecuencia razonable**, común y natural de la acción u omisión imputada al autor demandado.

No vemos nada en el expediente ni en la transcripción de la prueba en autos que nos mueva a modificar la apreciación de la prueba realizada por el TPI.

Veamos el error reclamado en el número undécimo. Ahí se reclama que el TPI cometió ese error al no admitir una prueba que no fue anunciada en el Informe de Conferencia con Antelación a Juicio y tampoco se intentó presentar dicha prueba cuando iba a empezar el juicio y se marcó la totalidad de la prueba que se proponían presentar las partes. La parte apelante ha intentado presentar prueba después de sometido su caso. En esa etapa no procedía admisión de prueba alguna que presentara la parte que

ya había anunciado que sometía su caso y no podía reabrir su turno de prueba como intentó y ahora reclama en apelación. No se cometió ese error.

Como duodécimo error, la apelante reclama que, al completar su prueba ante el TPI, debía transferirse el peso de la prueba restante a la parte demandada, aquí apelada. No tiene razón.

La apelante, como demandante ante el TPI tenía el peso de probar su reclamo de daños y perjuicios extracontractuales. Repitiendo lo antes indicado sobre el derecho aplicable: para que prospere una acción por daños y perjuicios bajo el artículo 1802, como es el caso que nos ocupa, es necesario que quién reclame como demandante, pruebe la ocurrencia de una acción u omisión culposa o negligente que ocasiona un daño y la existencia del nexo causal entre ambos. *Colón Santos v. Coop. Seg. Mult. P.R.*, 173 DPR 170, 177 (2008). Es decir, procede la reparación de un daño cuando se demuestran los siguientes elementos indispensables: (a) la existencia de una acción u omisión producto del acto ilícito extracontractual; (b) la antijuricidad de esta; (c) la culpa o negligencia del agente; (d) la producción de un daño; y, (e) la relación de causa a efecto entre la acción u omisión y el daño. *Valle v. E.L.A.*, 157 DPR 1, 14 (2002). La parte demandante tiene que probar todos los elementos señalados en su turno inicial de prueba. La Moción que presenta la parte demandada, aquí apelada, al finalizar el desfile de prueba de la demandante, parte de la premisa que dicha parte que tenía el peso de probar todos los elementos de este tipo de reclamo, no lo hizo.

Ante ello, el TPI correctamente evaluó si se había desfilado prueba sobre los elementos de la causa de acción reclamada o no.

Resolvió que no y hizo lo correcto, desestimar el caso. No se cometió este error tampoco.

Por todo lo antes indicado, procede confirmar la Sentencia contra la que aquí se recurre.

**IV.**

Por los fundamentos antes expuestos, se confirma el dictamen apelado.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones